Aaron JONES, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 20679.

United States Court of Appeals
District of Columbia Circuit.

Argued June 6, 1967.

Decided Sept. 29, 1967.

Mr. Joseph Patrick Clancy, Washington, D. C. (appointed by this court), for appellant.

Mr. William R. Weissman, Sp. Atty., Office of the United States Atty., New York City, of the bar of the Court of Appeals of New York, *pro hac vice*, by special leave of court, with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker and Seymour

Glanzer, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, BASTIAN, Senior Circuit Judge, and ROBINSON, Circuit Judge.

PER CURIAM:

Appellant was charged with the second degree murder of John Hyland Rinker and convicted by a jury of manslaughter. At the trial, he admitted that he shot and killed Rinker with a pistol but claimed that he acted in self-defense.

The uncontradicted evidence revealed that following an altercation in an elevator involving appellant, Rinker, and one Robert Houston,[1] appellant went to his apartment on the third floor of the building, armed himself with a pistol, and proceeded to the fifth floor, where the fatal episode occurred. Appellant testified that he went to the fifth floor "to see why the man kicked me, after I hadn't done anything to him." There, he avowed, he observed Rinker and Houston walking down the corridor toward him, and heard Houston say "there he is." Appellant added that at the time the fatal shot was fired Houston had a butcher knife in his hand, and that Rinker had his hand in his pocket and "come toward me as if he were going to take something out of it, do something to me." A police detective, who arrived on the scene shortly after the shooting, testified that he found Rinker lying in the corridor with his hand in his pocket, and that in his hand was a penknife with the blade open.

One of the witnesses called by the Government was Maria Ann Davis, who was in appellant's apartment at the time these events transpired. She testified on direct examination that appellant came there, went to a desk where he kept a gun, and left immediately, and that she noticed that "he had a spot on the back of his pants, looked like somebody had kicked him." When appellant returned to the apartment, she recounted, he put a gun in the desk drawer, and "just told me he was going to jail, that he shot a man."

On cross-examination, counsel for appellant asked her to restate what appellant had said to her on his return, and she replied: "He told me he had shot a man. And I didn't believe him at first. But I asked him why, and he said he went upstairs and asked the man why did he kick him. And the other man—one man came out after him with a butcher knife and the other one went in his pocket, so he did it to protect himself." On redirect examination by the Government, the following exchanges took place:

"Q. Now, on May 22, 1966, when you were at the Homocide [sic] Squad, do you recall being asked the following question and giving the following answer:

" 'Question: Did Aaron tell you of any argument he had with the man?'

" 'Answer: The only—he said was that the man was drunk on the elevator and he kicked him and the dog and he asked him not to kick the dog or step on the dog. He didn't say anything else about it.'

"Do you recall that question and answer?

"A. Yes, I do.

"Q. Do you deny making that statement?

"A. No.

\*     \*     \*     \*     \*     \*

"Q. Do you recall being asked this question and giving this answer:

" 'Question: Is there anything you wish to add to the statement that has not been covered?

" 'Answer: No. I don't have anything else to add.'

[1.] Rinker and Houston were friends and were ascending to Houston's apartment on the fifth floor. Appellant, accompanied by his dog which he had just taken for a walk, was returning to his third-floor apartment. The difficulty arose when appellant accused Rinker of kicking the dog, a charge Rinker denied.

"Do you recall being asked that question and giving that answer?

"A. I guess so, if it is on there.

\*    \*    \*    \*    \*    \*

"Q. Now, page five of your Grand Jury testimony, which I have already shown to defense counsel, Your Honor.

" 'Question: Did he tell you at any time about an argument he had with a man on the elevator about kicking his dog?

" 'Answer: He told me the guy kicked the dog and he asked him not to or step on the dog. My dog is very playful. He asked him not to kick the dog again and the guy pushed him off the elevator.'

"Do you recall that question and that answer?

"A. (Witness nods assent)."

■ The Government then offered in evidence the exhibits containing these prior statements "solely with respect to this witness' credibility," claiming that it had been surprised by her testimony. Counsel for appellant stated that he had no objection, and the exhibits were introduced. The trial judge did not instruct the jury as to the limited purpose for which the statements were received, either at that time or in his charge. Appellant's attorney never requested such an instruction, and expressed satisfaction with the judge's charge when it was concluded. Appellant now contends, however, that the judge committed reversible error in not giving *sua sponte*, a cautionary instruction, both when the statements were let into evidence and at the close of the case.[2]

Any resolution of this issue importantly involves our statute confining "the party producing a witness," in the use of prior inconsistent extrajudicial statements by the witness, to "the purpose only of affecting the credibility of the witness,"[3] and our interpreting decisions in Bartley v. United States[4] and Coleman v. United States,[5] none of which the Government saw fit to mention, much less to discuss, in its brief. In *Bartley*, we held that a trial judge's failure at some time to instruct the jury as to the narrow purpose for which incompatible declarations previously made by a party's own witness are permitted consideration was plain error which under the circum-

2. Appellant also, as ground for reversal, claims error in the trial court's refusal to admit into evidence a docket entry indicating that Rinker had been convicted of an assault on a police office. He argues that this evidence had relevance as a showing of Rinker's propensity for violence and aggressive behavior, thus bolstering his claim of self-defense. This argument might have merit if the tendered evidence had shown the nature of the conduct for which Rinker had been convicted. See Evans v. United States, 107 U.S.App.D.C. 324, 277 F.2d 354, 1 A.L.R.3d 566 (1960) (error to exclude evidence of deceased's aggressiveness when drunk, where the defense was that a killing was necessary to repel a sexual assault, and the evidence showed that deceased was drunk). So far as appears from the record, however, appellant's proffer consisted solely in the docket entry, which disclosed only that Rinker had been convicted under D.C.Code § 22–505 (1961 ed.). Since that section makes criminal nonviolent obstruction of a police officer in the performance of his duty as well as assault and physical in-

terference, the proffer was inadequate to apprise the trial court of the relevance of the evidence. Thus we conclude that the ruling was correct.

3. "When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, *for the purpose only of affecting the credibility of the witness*, that the witness has made to the party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause. Before such proof is given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he made the statements and if so allowed to explain them." D.C.Code § 14–102 (1967 ed.). (Emphasis added.)

4. 115 U.S.App.D.C. 316, 319 F.2d 717 (1963).

5. 125 U.S.App.D.C. 246, 371 F.2d 343 (1966), cert. denied 386 U.S. 945, 87 S. Ct. 979, 17 L.Ed.2d 875 (1967).

stances affected substantial rights.[6] In *Coleman,* we affirmed a conviction where the trial judge's charge had informed the jury that statements of that type might be accredited only for their bearing on the credibility of the witness, but· we nonetheless stated that "[f]rom this day forward * * * we read the statute as contemplating a ruling by the trial court which comprehends, in addition to a finding of surprise, an immediate representation to the jury as to the purpose for which the impeaching statements are being permitted to come in." [7]

The Government argues that the divergence from *Bartley* and *Coleman* in this case should stand because appellant's failure to contest the admission or request an admonitory instruction was the product of a tactical choice,[8] and so a waiver of any objection to their general use. The Government's theory is that appellant preferred to forego limiting instructions in order to avoid the risk of focusing attention on variations between appellant's testimony [9] and that given by Miss Davis on her redirect examination. But not only is the record silent as to any such decision by appellant or his counsel, but it discloses that appellant's attorney, on recross-examination of Miss Davis,

specifically mentioned the apparent contradiction of her trial testimony by her pretrial statements, and elicited from her an explanation of the discrepancy. This seems to us to be irreconcilable with an ambition to divert the jury's attention from an embarrassing testimonial conflict.[10]

■ The Government also contends that by questioning Miss Davis concerning appellant's statements following the shooting, appellant's counsel raised new matter on his cross-examination, and that to this extent Miss Davis became appellant's witness.[11] *Bartley* and *Coleman,* we repeat, were decided under a statute which in terms deals only with impeachment of a party's own witness, which the Government says was not the case when it again questioned Miss Davis on redirect examination on the matter. We do not accept this premise. The Government, on direct examination, specifically asked the witness to relate what appellant had said on returning to the apartment after the shooting. By eliciting further testimony on this same point, appellant's counsel did not improperly expand the scope of cross-examination.[12] Nor, in our view, would the *Bartley-*

---

6. 115 U.S.App.D.C. at 318–319, 319 F.2d at 719–720. See also F.R.Crim.P. 52(b).

7. 371 F.2d at 346.

8. See Troublefield v. United States, 125 U.S.App.D.C. 339, 372 F.2d 912 (1966).

9. Appellant testified that when he returned to the apartment after the shooting "I told her that I had shot a man. She wanted to know why, and I told her because he kicked me off the elevator." Appellant was then asked, "Did you tell her anything else?", to which he replied "I just said I was going to jail."

10. The Government's theory probably could not, in any event, have explained the failure to object to the admission of Miss Davis' prior statements or to request an admonition at that time, since appellant did not take the witness stand until *after* Miss Davis had completed her testimony. And while its theory could better suppose why there was no request for a limiting instruction at the close of the evidence, we find nothing in the record affirma-

tively suggesting that it was because appellant or his counsel made a tactical decision. The trial judge never asked appellant's attorney if he wished a cautionary instruction to be given, and there was no express waiver. *Cf.* Troublefield v. United States, *supra* note 8.

11. A related suggestion by the Government is that *Bartley* and *Coleman* are inapposite because they involved situations where the "surprise" testimony came forth on direct examination, while here the adverse testimony was elicited by appellant's attorney on cross-examination. We see no significance in such a distinction.

12. See 3 Wigmore, Evidence § 914 (3d ed. 1940). Professor Wigmore strongly criticizes the rule that by improper cross-examination one may make a witness his own, and thereby preclude himself from impeachment, as confusing principles relating to the order of presenting evidence with those dealing with the scope of impeachment.

*Coleman* doctrine become inefficacious even if the premise were correct.

■ The rule that a party may not impeach his own witness is distinct from the rule that an earlier contradictory statement made extrajudicially by a non-party witness, since it is hearsay, may be received only for its tendency to demonstrate that the witness is unworthy of belief. The statute merely codifies a common law exception to the first rule,[13] and the second rule is as applicable to impeachment of another's witness as it is to impeachment of one's own.[14] Our *Bartley* and *Coleman* decisions, in going beyond the explicit requirements of the statute, represent our strong and continuing endorsement of the principle that hearsay statements are not to be considered by juries, and the rationale of these cases cannot logically or justifiably be restricted to instances of impeachment of the party's own witness. We hold that the salutary instructions they demand when a party seeks to impeach by inconsistent extrajudicial statements a witness he himself has called are, unless manifestly waived, equally required when he undertakes impeachment by that method of a witness produced by his adversary.

■ Finally, the Government insists that the failure to caution the jury was not prejudicial to appellant. We are told, in this connection, that the prior

13. Wheeler v. United States, 93 U.S.App. D.C. 159, 165. 211 F.2d 19, 25 (1953), cert. denied 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954).

14. See 3 Wigmore, Evidence § 1018 (3d ed. 1940); F.R.Crim.P. 26.

15. 115 U.S.App.D.C. at 319, 319 F.2d at 720. Of course it is not true here, as it was in *Bartley*, that the *only* basis the jury had for drawing the unfavorable inference was the prior statement of the

statements contained "no facts otherwise not in evidence", and that "Miss Davis' testimony receded into virtual insignificance" as the trial moved on. But it is evident that the jury could have inferred from the witness' out-of-court statements that appellant had not in fact made reference to his having been threatened with a knife, or to his having acted in self-defense, when he came back to the apartment after the shooting. Thus, by impermissibly crediting the witness' pretrial utterances rather than her trial testimony, the jury may well have accepted as a fact a circumstance damaging to the claim of self-defense. As was the situation in *Bartley*, "[w]ithout the protection of an admonition or instruction from the court * * * we cannot say that the jury did not give weight, when it was not entitled to do so, to the prior * * * statement[s] and feel itself free to choose between the conflicting versions. * * * So viewed, the error made in the application of the statute * * * was replete with substantial danger to the appellant, and requires that he be afforded a new trial." [15]

We reverse the conviction appealed from and remand the case for a new trial.

Reversed and remanded.

BASTIAN, Senior Circuit Judge, did not participate in the decision or opinion in this case.

witness. Here, the jury might have inferred from appellant's own testimony (see note 9, *supra*) that he had made no mention of having been threatened with a knife. However, the admission, without appropriate instruction, of the prior statements of Miss Davis may well have played an important role in persuading the jury to reject the appellant's self-defense claim. We therefore cannot conclude that there was no prejudice.