**UNITED STATES of America**
**v.**
**James H. BURKS, Appellant.**
**No. 71-1821.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 8, 1972.

Decided Oct. 19, 1972.

---

Mr. R. Jack Roberts, Washington, D. C., with whom Mr. Lawrence Speiser, Washington, D. C. (both appointed by this court), was on the brief, for appellant.

Mr. James A. Fitzgerald, Asst. U. S. Atty., with whom Messrs. Harold H. Titus, Jr., U. S. Atty., and John A. Terry and Edwin A. Williams, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT and LEVENTHAL, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

Appellant was charged with first degree murder and carrying a dangerous weapon. The facts, according to the Government's version of the story, indicated deliberate and premeditated murder. The decedent Price owed appellant part of the purchase price of a truck. Appellant visited Price on the morning of December 19, 1969, at the apartment

project where Price worked, and asked Price to either pay the money or return the truck.[1] After Price refused, an argument ensued in which verbal threats were exchanged, but appellant left before any fight erupted. Later in the day appellant went to the house of a friend named Lombre where he obtained a gun. Returning to the apartment project that afternoon, he walked over to Price, who was then fixing an outside door to one of the apartments, pushed him into the apartment, and shot him three times.

Appellant took the stand and admitted firing the fatal shots, but he claimed to have acted in self-defense. According to his version of the incident, he had called his friend Lombre after his initial confrontation with Price and asked Lombre to drive him back to the apartment project later in the afternoon. His purpose in returning was not to encounter Price again, but rather to talk to Price's employer who had agreed to try to talk Price into settling the debt. Appellant wanted Lombre to come along for protection[2] as he was afraid of Price, not only because Price had threatened him and had warned him not to try to take back the truck, but also because Price was much larger than appellant and appellant knew that Price had killed his own six-year-old son some years earlier.[3]

When appellant arrived at Lombre's home before returning to the apartment project, Lombre was very sleepy, apparently as a result of holiday season partying, and was thus unable to drive him there as they had earlier agreed. Remembering that Lombre kept a revolver, appellant searched for and found the gun and put it in his jacket, intending to use it only to frighten Price off in the event of a physical attack. When he saw Price working outside one of the apartments, Price called to him to come over and then asked him to step inside the apartment with him. Once inside, appellant testified, Price told him "he wanted [him]" and started coming toward him. Appellant warned that he had a gun. Price said, "Go ahead and shoot," and moved as if to swing at appellant, who then fired.

The jury found appellant guilty of carrying a dangerous weapon and second degree murder. Because the trial court committed prejudicial error in refusing to admit certain evidence offered by the defense, we reverse the conviction of second degree murder.

I

In order to corroborate appellant's own version of the killing, the defense attempted to introduce evidence of Price's violent and dangerous character—specifically evidence that Price had killed his own six-year-old son in 1965. As this court has long recognized, evidence of the deceased's violent character, including evidence of specific violent acts, is admissible where a claim of self-defense is raised. Such evidence is relevant on the issue of who was the aggressor[4] and, where there is evidence

1. Appellant testified that he and Price had agreed earlier that if Price did not come up with the money by Dec. 19 appellant would take the truck back and could use it until Price paid the debt.

2. Appellant also needed a ride back to the apartment. From what is indicated in the record, appellant did not own a car of his own except for the truck which he had sold to Price but which was still registered in his name. He drove out to see Price in the morning in a friend's car, and when he returned later in the afternoon after his visit with Lombre, he borrowed another friend's car.

3. When asked why he was afraid of Price, appellant testified: "Several reasons maybe. Mr. Price was much larger than I was, kind of solidly built and mean. * * * I knew that if he could beat his six-year old boy to death, he wouldn't probably hesitate to beat me to death, too."

4. It bears emphasis, since the trial court in the case at bar was confused on this point, that as to the issue of who was the aggressor it is irrelevant that the defendant did not know about the deceased's character. "'[The] additional element of communication is unneces-

that the defendant knew of the deceased's character, on the issue of whether or not the defendant reasonably feared he was in danger of imminent great bodily injury.[5] *See* Evans v. United States, 107 U.S.App.D.C. 324, 277 F.2d 354 (1960); Marshall v. United States, 45 App.D.C. 373 (1916).

The defense first tried to introduce evidence of the deceased's character through the testimony of the deceased's wife, Mrs. Price. When the defense called her to the stand, however, the court questioned the propriety of her testifying and, after a long and confusing colloquy between court and counsel, the court ruled that it would advise Mrs. Price that she need not testify. The court's decision was apparently based on 14 D.C.Code § 306(a) (1967) which provides: "In civil and criminal proceedings, a husband or his wife is competent but not compellable to testify for or against the other."

■ The common law privilege of one spouse not to testify "for or against" the other is limited in two respects, either of which would bar its application here. First, the privilege applies only when the testimony of one spouse would favor or disfavor "the other spouse's *legal interests in the very case* in which the testimony is offered."[6] 8 J. Wigmore, Evidence § 2234, at 231 (Mc-

sary; for the question is what the deceased probably did, not what the defendant probably thought the deceased was going to do. The inquiry is one of objective occurrence, not of subjective belief.'" Evans v. United States, 107 U.S. App.D.C. 324, 326, 277 F.2d 354, 356 (1960), quoting 1 J. Wigmore, Evidence, § 63, at 470–471 (3d ed. 1940). *See* State v. Griffin, 99 Ariz. 43, 47, 48, 406 P.2d 397, 399–400 (1965); Harris v. State, Okl.Cr.App., 400 P.2d 64 (1965). *See generally* Annot., 1 A.L.R.3d 571, 601–603 (1965), and cases cited therein.

There clearly was an issue in this case as to who was the aggressor. The prosecution's theory was that appellant pushed Price into the apartment and fired the first shot into his back. Appellant, on the other hand, testified that he shot Price only after Price started coming toward him as if to swing at him. The other evidence in the case was also inconsistent on this point. The pathologist testified that the first shot hit Price in the back. Mrs. Weaver, who lived in the apartment and was an eyewitness to the shooting, testified as a Government witness that appellant fired the first shot while the two were facing each other.

5. *See* 2 J. Wigmore, Evidence §§ 246, 248 (3d ed. 1940). Counsel for the prosecution argued during the colloquy with the court that if the issue were the defendant's belief, then the proof should be limited to testimony by the defendant. He maintained that extrinsic proof of the acts should be inadmissible. This argument is incorrect for the following reasons. The issue in a case of self-defense—whether the defendant reasonably feared grave bodily injury—breaks down into two sub-issues: (1) whether the defendant did *in fact* fear imminent grave bodily injury, and (2) whether the defendant's fear was that of a reasonable man. When a defendant takes the stand and testifies that he feared the decedent because he had heard that the decedent had committed a particular violent act, the jury is, of course, free to question whether the defendant is telling the truth. It is conceivable, for example, that the defendant never heard any such information. Extrinsic proof that the decedent did in fact commit the violent act serves to corroborate the defendant's testimony as to what he heard, and is therefore relevant to the question whether the defendant did, in fact, fear injury at the hands of the decedent. *See* Dempsey v. State, 159 Tex.Cr.R. 602, 266 S.W.2d 875 (1954). *Dempsey* involved a fact situation remarkably similar to our own. Appellant there admitted killing the deceased but claimed he acted in self-defense "believing that the deceased, who he knew had recently cut his nephew's throat, had a pistol or knife and was about to attack him." *Id.* at 876. On appeal the issue was whether it was proper to admit extrinsic proof of the decedent's violent act when the defendant had already testified about it. The court held: "Appellant testified that he knew the deceased 'had just cut his nephew's throat'. He should have been permitted to prove as a fact such act of violence." *Id.* at 878.

6. Wigmore found it difficult to rationalize this limitation. "If," he asserted, "the fear of causing marital dissension or disturbing the domestic peace were genuinely the ground of the privilege * * *, then the privilege should apply to testi-

Naughton rev. 1961). (Emphasis in original.) *See* Halback v. Hill, 49 U.S. App.D.C. 127, 130, 261 F. 1007, 1010 (1919). Mr. Price's legal interests were in no way at stake in this case and the privilege was therefore inapplicable. Second, the privilege ends with termination of the marital relationship through the death of one spouse. *See* 8 J. Wigmore, *supra*, at 238–239. The policy of the privilege—protection of family harmony [7]—cannot be served if the marital relationship has already ended.[8] While this court has held that 14 D.C.Code § 306 is "a congressional enactment which completely abrogates the common law rule as far as this jurisdiction is concerned," Postom v. United States, 116 U.S.App.D.C. 219, 220, 322 F.2d 432, 433 (1963), cert. denied, 376 U.S. 917, 84 S.Ct. 672, 11 L.Ed.2d 613 (1964), we have also had occasion to note that the purpose of Congress in enacting this statute "was to remove grounds of incompetency, and not increase them. \* \* \* Therefore a hus-

band or wife, under this statute, can claim no greater privilege than existed at common law." Halback v. Hill, *supra*, 49 U.S.App.D.C. at 130, 261 F. at 1010.

■ Thus it was error for the court to hold that under 14 D.C.Code § 306(a) Mrs. Price had a privilege not to testify. Nor can the court's action be justified on the basis of the privilege not to reveal confidential marital communications. *See* 14 D.C.Code § 306(b) (1967). While this privilege survives the death of one spouse, *see* Hopkins v. Grimshaw, 165 U.S. 342, 351, 17 S.Ct. 401, 41 L.Ed. 739 (1897); United States v. Lewis, 140 U.S. App.D.C. 40, 43 n. 10, 433 F.2d 1146, 1149 n. 10 (1970); McCartney v. Fletcher, 10 App.D.C. 572 (1897), it was nevertheless inapplicable in this case. The confidential communications privilege does not extend to noncommunicative acts, United States v. Lewis, *supra,* and a communication otherwise privileged loses its privileged character on coming into the hands of a third party, Dicker-

---

mony which in any way *disparages* or disfavors the other spouse, irrespective of his being a party to the cause \* \*." 8 J. Wigmore, Evidence 230–231 (Mc-Naughton rev. 1961). (Emphasis in original.) Wigmore argues that the "attempt to be logical" with the marital privilege came to failure because the underlying theory of the privilege was itself questionable. *Id.* at 231. As he states: "[The marital privilege] is entertaining (if any error in the law can ever be entertaining) because of its exhibition of the subtle power of cant over reason and of the solemn absurdity of explanations which do not explain and of justifications which do not justify." *Id.* at 213.

In any event, the cases indicate that American jurisdictions, including our own, have accepted the common law limitation. *See, e. g.,* Halback v. Hill, 49 U.S.App.D.C. 127, 130, 261 F. 1007, 1010 (1919); People v. Langtree, 64 Cal. 256, 258, 30 P. 813, 814 (1883); State v. Parrott, 79 N.C. 615, 617 (1878); State v. Briggs, 9 R.I. 361, 365 (1869). *See also* United States v. Lewis, 140 U.S.App.D.C. 40, 43, 433 F.2d 1146, 1149 (1970), which refers to the privilege as "disqualifying a spouse as a witness in litigation to which the other is a party."

7. *See* Hawkins v. United States, 358 U.S. 74, 77–78, 79 S.Ct. 136, 3 L.Ed.2d 125 (1958); Lutwak v. United States, 344 U.S. 604, 615, 73 S.Ct. 481, 97 L.Ed. 593 (1953).

8. "Is there for married pairs a posthumous peace, capable of fracture by service of subpoena upon the survivor, and therefore fit to be forfended by the law? If so, then the privilege should extend a post mortem protection. But unless we assume such a theory, the privilege ceases upon the death of a spouse." 8 J. Wigmore, *supra* note 6, at 238. *See* United States v. Gonella, 3 Cir., 103 F.2d 123, 124 (1939); Fox v. Fox, 75 Wyo. 390, 402, 403, 296 P.2d 252, 255–256 (1956). *Compare* cases holding that divorce terminates the privilege. *See, c. g.,* Pereira v. United States, 347 U.S. 1, 6, 74 S.Ct. 358, 98 L.Ed. 435 (1954); Volianitis v. Immigration and Naturalization Service, 9 Cir., 352 F.2d 766, 768 (1965); United States v. Ashby, 5 Cir., 245 F.2d 684, 686 (1957); Hoss v. Purinton, 9 Cir., 229 F.2d 104, 108–109, 16 Alaska 48, cert. denied, 350 U.S. 997, 76 S.Ct. 547, 100 L.Ed. 861 (1956).

son v. United States, 62 App.D.C. 191, 65 F.2d 824, cert. denied, 290 U.S. 665, 54 S.Ct. 89, 78 L.Ed. 575 (1933). Under either of these doctrines, the confidential communications privilege would not apply to Mrs. Price's testimony about her husband's beating to death their own child. And if counsel for defendant would have questioned Mrs. Price about other aspects of the deceased's character, conceivably asking her to reveal confidential communications, the appropriate procedure in that event would have been to object to the questions as asked, or to *voir dire* Mrs. Price out of the presence of the jury to ensure that no such questions would be asked before the jury.[9] In any case, it was wrong to hold that the witness had the right to refuse to take the stand when it was clear that some of her testimony would have been outside the confidential communications privilege.

At oral argument counsel for the Government contended that appellant should be barred from challenging the court's ruling since the defense never actually called Mrs. Price to ask her whether she would exercise the erroneously granted privilege. Our reading of the record indicates, however, that it was clear to all concerned that Mrs. Price was not going to testify unless she had to. In fact, in making its ruling the court brought the matter to a close by stating, "Well, we'll tell her that she doesn't need to testify. Have you got anything else?" While the proper procedural course would have been to ask Mrs. Price to exercise her privilege for the record, we can attach no significance to the defense's failure to do so in this particular case.

■ It also appears from the record that the error in barring this testimony was prejudicial. Appellant admitted the shooting, and his sole defense was self-defense. The evidence he sought to introduce was vital to this defense and, even if it might not have induced the

jury to acquit, it might well have induced it to return a verdict of guilt for the lesser included offense of manslaughter instead of second degree murder. *See* Evans v. United States, *supra*. Nor is it significant that appellant had already brought some attention to the child killing by mentioning it when he testified on his own behalf. While the jury might have discredited his testimony on this issue, it would have had virtually no choice but to believe Mrs. Price if she had taken the stand and testified that Mr. Price had killed their son.

## II

■ The defense also sought to prove Price's violent character by introducing his conviction of a violation of 22 D.C. Code § 901 (1967) which makes it unlawful to "torture, cruelly beat, abuse, or otherwise wilfully maltreat any child under the age of eighteen years * * *." Price had pleaded guilty to this charge, apparently after the Government dismissed an indictment for second degree murder that had issued after the child killing incident. The trial court barred this evidence also, apparently on the ground that appellant testified that he was fearful because the decedent was a "child-killer," while the conviction was only for cruelty to the child. As noted earlier, however, where self-defense is raised and there is an issue as to who was the aggressor, evidence of the deceased's violent character is relevant and admissible even though unknown to the defendant. *See* note 4 *supra*. Thus the defense in this case had a right to prove any violent acts of the decedent, regardless of whether appellant testified that he knew about those acts.

Counsel for the Government also argues that since it is possible to violate 22 D.C.Code § 901 in a nonviolent manner—keeping a child chained or depriving him of food are examples given by the Government—proof of the conviction is in-

9. *See* United States v. Lewis, *supra* note 6, 140 U.S.App.D.C. at 45 n. 22, 433 F.2d at 1151 n. 22; Sacks v. Sacks, 75 U.S. App.D.C. 165, 124 F.2d 527 (1941).

admissible under the rule set down in Jones v. United States, 128 U.S.App.D.C. 36, 385 F.2d 296 (1967). The record in *Jones* indicated that the proffered evidence "consisted solely in the docket entry, which disclosed only that [the decedent] had been convicted under D.C. Code § 22–505 (1961 ed.)." 128 U.S. App.D.C. at 38 n. 2, 385 F.2d at 298 n. 2. We held that the trial court properly refused to admit the docket entry into evidence because 22 D.C.Code § 505 not only makes unlawful the violent act of assaulting a police officer, but also makes it illegal to obstruct, even in a nonviolent manner, a police officer in the performance of his duties. We reasoned, then, that the docket entry did not show "the nature of the conduct for which [decedent] had been convicted." *Ibid.* In other words, the proffered evidence did not prove any prior violent act on the part of the decedent.

Even assuming, *arguendo* to be sure, that such cruelty as depriving a child of food or keeping him in chains is nonviolent, the facts of this case do not fall within the rationale of *Jones*. In the case at bar, the violent nature of the conduct for which Price had been convicted was indicated by the evidence tendered to the trial court. This was no mere docket entry of a conviction disclosing only the citation of the statute violated, but a conviction based on a plea of guilty to an indictment that charged that the decedent Price did "beat, abuse and otherwise willfully maltreat" his six-year-old son. The proffered evidence thus indicated a past violent act of the decedent Price and was not made inadmissible by our decision in *Jones*.

Since barring proof of the conviction only compounded the prejudicial error made by the court in informing Mrs. Price that she need not testify about the same occurrence, we must reverse the conviction of second degree murder and remand for proceedings consistent with this opinion.

So ordered.

BAZELON, Chief Judge, concurring:

I agree that appellant's conviction must be reversed and the case remanded for a new trial because the trial judge erred in excluding the testimony of the victim's widow and the victim's criminal record. There is, however, another serious contention relating to the ineffectiveness of defense counsel which the Court today does not discuss. Although it is not necessary to decide whether this claim alone would warrant reversal, I discuss it since it may be pertinent to any new trial in this case.

I.

Among the inadequacies in trial counsel's representation were the following:

1. Defense counsel never sought discovery under Fed.R.Crim.P. 16(a) nor did he request the *Jencks* statements of government witnesses. The *Jencks* materials were made available only at the court's initiative. (Tr. 45–6)

2. Defense counsel, despite the trial judge's efforts to enlighten him, did not comprehend the difference between impeaching a witness and refreshing his recollection. (Tr. 137–49)

3. Defense counsel repeatedly evidenced his lack of knowledge as to the proper scope of cross-examination, and he seemed to have difficulty understanding that he could not introduce defense exhibits while the government was presenting its case. The trial judge finally had to explain:

But you see . . . I don't know how many cases you have tried, but you are the defendant and you offer no evidence until the defense's case is going on. You could mark exhibits for the defendant, but you don't offer them until the defense case is going on. (Tr. 298)

4. The defense attorney was also unfamiliar with the rules governing the introduction of character evidence, including the leading case on the subject, Michelson v. United States.[1] After de-

1. 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

fense counsel had demonstrated considerable ineptitude in questioning his first character witness, the court recessed to give him an opportunity to familiarize himself with the law in the area, citing *Michelson* and Shimon v. United States.[2] When counsel returned to court [3] and resumed questioning the same witness, he still exhibited a lack of understanding as to the proper means of eliciting character testimony. There were repeated objections and bench conferences. From two of his character witnesses counsel was unable to obtain any admissible evidence. The examinations of his other three character witnesses produced only one-word answers to his inquiry as to the defendant's reputation for peace and good order in the community—two witnesses responded "good" and a third "excellent". On the other hand, the prosecutor was able to recite the fact that appellant had previously been convicted of armed robbery to each of these witnesses; and two of the witnesses who did offer admissible character testimony conceded that they had previously been unaware of appellant's criminal record.

Defense counsel also had some difficulty in securing the admission of evidence as to the deceased's character. In explaining why such evidence should be admissible counsel could only cite an 1895 case.[4] He explained the lack of any more recent precedent in an exchange which is revealing as to both his resources and his technical knowledge.

> COUNSEL: What I want to do is get to the deceased's character through a witness. . . . And this goes, Your Honor, to the proposition that based on the self defense theory, my client has the right to have the deceased's character in evidence.

THE COURT: Give me some authority . . . .

COUNSEL: My authority . . . is Travers versus the United States, which is, I believe, is cited at Sixth Appeals, D.C., page . . .

THE COURT: Anything more recent than that?

COUNSEL: Your Honor, I tried to shephardize . . . the case, but the Shepherd . . . citator was absent from the library. (Tr. W. 64).

5. Defense counsel was similarly inept in handling the issue of marital privilege. He merely asserted to the court that the deceased's wife's privilege died with her husband. When asked whether he had any authority for that proposition, he responded:

> I don't have any authority for that, Your Honor. I couldn't find any. (Tr. W. 65)

The court again recessed to allow counsel to research the pertinent law, the trial judge providing him with a citation to the D.C.Code's marital privilege provision. On his return, counsel was able to. express a policy distinction between the two sections of the statute, but was still without authority to support any of his assertions. The judge's erroneous exclusion of the wife's testimony, on the basis of her marital privilege is one of the grounds for our reversal of appellant's conviction.

6. Although defense counsel was aware of the defendant's prior conviction, he appears to have been unfamiliar with the principles of Luck v. United States [5] and did not request a *Luck* hearing. Since he was also unfamiliar with the provision of the D.C. Court Reorganization Act [6] pursuant to which the

---

2. 122 U.S.App.D.C. 152, 352 F.2d 449 (1965).

3. Counsel returned to court late with no excuse other than that he had been researching the law. The trial judge held him in contempt and fined him $100. (Tr. 321–27)

4. Travers v. United States, 6 App.D.C. 450 (1895).

5. 121 U.S.App.D.C. 151, 348 F.2d 763 (1965).

6. 14 D.C.Code § 305 (Supp. 1971). There is a constitutional issue, which we needn't reach here, as to whether that pro-

**440**

appellant's prior record was introduced as impeachment evidence, the court instructed counsel to "take a look at it" before the defendant testified. (Tr. 314).

7. The Court reverses appellant's conviction in part because of the trial judge's erroneous exclusion of the decedent's criminal record. On the second day of trial defense counsel asked that the record "be brought before the Court." Explaining that the deceased had a record of "child neglect or homicide" (Tr. 348), counsel implied that he would introduce the record through a defense witness, the deceased's former employer. The witness was never asked about the deceased's criminal record. The next day, defense counsel tried unsuccessfully to introduce the record through the testimony of the deceased's wife and his sister. It was apparent that the defense attorney had never seen any such record and it soon became equally obvious that he did not even know how to find it. The judge finally inquired:

THE COURT: Actually, what you want, isn't it, is the record of this man's convictions?

COUNSEL: That is right, Your Honor.

THE COURT: Well, why don't you subpoena them?

\*   \*   \*   \*   \*   \*

You have had all this time. You have had this case for some time in preparation, haven't you?

COUNSEL: I mentioned it to Your Honor yesterday.

THE COURT: You said nothing about making an application for subpoena. You did so far as those character witnesses are concerned.

COUNSEL: Yes, I asked about it yesterday for the forthwith because the custodian would be necessary because . . .

THE COURT: Well, there is a piece of paper, you know, in this court-

house. You knew well enough to use it for your character witnesses. . . How old is this case?

COUNSEL: A year and a half, Your Honor.

THE COURT: Is it still in the courthouse?

COUNSEL: Is what in the courthouse?

THE COURT: The case that you want brought up here, the conviction. The file—don't you?

COUNSEL: No, Your Honor, it would not be in the courthouse. It would be a police record or an FBI record.

THE COURT: Well, where was he convicted?

COUNSEL: I believe he was convicted here.

\*   \*   \*   \*   \*   \*

THE COURT: Well, why wouldn't it be in the courthouse then?

COUNSEL: I guess it would be, Your Honor.

THE COURT: Did you ever go down and look for the files?

COUNSEL: No, I did not. (Tr. W. 78–9)

The legal discussion of whether the record was admissable took place entirely between the court and the prosecutor; defense counsel demonstrated no familiarity with the cases being discussed and cited none of his own.

8. Defense counsel's ignorance of the procedure for requesting lesser included offense instructions led to the following exchange:

THE COURT: I am just wondering if defense counsel is aware of what he's doing. You haven't asked for a second-degree murder, lesser included; you haven't aked for a manslaughter, lesser included.

COUNSEL: Well, I assumed that would be given, Your Honor.

vision is an *ex post facto* law as applied in this case. The same question is before this Court, sitting *en banc*, in United States v. Marshall, no. 71–1491 (D.C.

Cir., filed June 10, 1971) ; United States v. Jeffries, no. 71–1356 (D.C.Cir., filed May 3, 1971).

THE COURT: You don't assume at all. There are two separate counts of this indictment, first-degree murder, premeditated, and second count of carrying a dangerous weapon.

COUNSEL: Well, in that case, Your Honor, I would ask for the lesser included offenses in these instructions. (Tr. W. 102)

## II.

The foregoing demonstrates the defense counsel's lack of familiarity with criminal trial practice. But the right to counsel requires a *"professional* advocate",[7] schooled in the law. Anything short of that contravenes the very purpose for the requirement of an attorney, as recognized in the earliest of the Supreme Court's right to counsel decisions, Powell v. Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932):

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. . . . Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step of the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

No matter how well-intentioned or diligent, a layman's representation would not satisfy the Constitutional requirement because of the layman's lack of skill and knowledge "in the science of law." The record in this case leaves a substantial doubt as to whether defense counsel, no matter how conscientious his efforts, satisfied the Constitutional requirement of an advocate with sufficient "skill and knowledge adequately to prepare [a] defense" to any criminal charge, to say nothing of the charge in this case—murder.

---

7. Johnson v. United States, 124 U.S.App. D.C. 29, 31, 360 F.2d 844, 846 (1966)

(Burger, J., concurring) (emphasis in original).