139 F.3d 748
 49 Fed. R. Evid. Serv. 21, 98 Cal. Daily Op.
Serv. 2104,
98 Daily Journal D.A.R. 2936
UNITED STATES of America, Plaintiff-Appellee,
v.
Ernestine Audry JAMES, aka Ernestine James, Defendant-Appellant.
 No. 96-30081.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 10, 1996.
Decided March 24, 1998.
 
 Withdrawn by 156 F.3d 1344.
 Peter Offenbecher, Assistant Federal Public Defender, Seattle, Washington, for defendant-appellant.
 Andrew R. Hamilton, Assistant United States Attorney, Seattle, Washington, for plaintiff-appellee.
 Appeal from the United States District Court for the Western District of Washington William L. Dwyer, District Judge Presiding. D.C. No. CR-95-00152-1-WLD.
 Before: NOONAN, THOMPSON and KLEINFELD, Circuit Judges.
 Opinion by Judge KLEINFELD; Dissent by Judge NOONAN.
 KLEINFELD, Circuit Judge:
 
 
 1
 The only issue raised in this case is whether the district court erred by excluding some evidence regarding the victim's violent past.
 
 FACTS
 
 2
 Appellant's daughter shot and killed appellant's boyfriend. For furnishing her daughter with the gun, the mother, appellant, was indicted for aiding and abetting manslaughter within Indian country, under 18 U.S.C. §§ 2, 1112, 1153. She was convicted in a jury trial, and sentenced to probation for five years. The daughter was prosecuted in a juvenile proceeding. The daughter's case is not at issue here.
 
 
 3
 The mother, Ernestine James, met her boyfriend, David Ogden (the victim), at a pow-wow in Seattle. He was nice sober, nasty drunk. Ogden had boasted to her about once killing a man and getting away with it. He told her he had sold another man a fake watch, and when the man complained, had stabbed him in the neck with a ball point pen. Ogden told appellant that "it was pretty funny watching a guy with a pen dangling out of his neck." He also bragged that he had once "ripped a side view mirror off the car and beat a man unconscious with it," and that, in yet another incident, he had robbed an old man by holding him down with a knife in his face and threatening to cut his eyes out.
 
 
 4
 James had seen Ogden's violence with her own eyes and suffered it. The worst was when Ogden was intoxicated and James refused to have sexual intercourse, so he threw her on the bed and raped her. On another occasion when Ogden wanted to have sexual intercourse with James and she had refused, he came into the room where she and her daughter Jaylene Jeffries were and started yelling at James and calling her names. The daughter got up and held Ogden at knife point with a carving knife until James ordered them both to desist. Ogden once struck the mother with a backhanded slap, giving her a swollen lip. Another time, he was drunk and wanted to have sexual intercourse with James, and would not take no for an answer until she broke a glass on the dresser and threatened him with it.
 
 
 5
 Once in their apartment, Ogden accused a friend of "looking at" James, and when the friend denied it, beat him up. When James and her daughter told Ogden to stop, he kept kicking and hitting the man, so James tried to dial 911. Ogden ripped the phone out of the wall. There was another phone in the bedroom, so James went to that phone and told her daughter to follow her. James had started dialing when Ogden broke the door down, on top of her daughter. James put the phone down, and the daughter, Jeffries, started hitting and kicking Ogden. James told them both to stop and told Ogden to leave. They both complied. Jeffries broke some of Ogden's ribs when she beat and kicked him.
 
 
 6
 When James and Ogden would go out for dinner, a few drinks, and window shopping, he would start yelling at strangers and challenging them to fights. Sometimes he and the strangers would fight. James also testified Ogden used to take his knife out of his sock, open and close it, and switch it back and forth between hands as if he were in a fight.
 
 
 7
 Jeffries, the daughter, had beaten Ogden on three occasions. She testified that "I was the one doing something, but he wasn't." Ogden would never fight back against her. He acted scared of her, even though she was only 14. As described above, she had broken his ribs on one occasion.
 
 
 8
 Ogden hated Jeffries' boyfriend, Michas Tiatano. Ogden, James, and Jeffries were Indian, but Tiatano was part Black and Asian. Ogden hated Black people. On the day Ogden was killed, the four of them had been together at a party. At one point during the party Ogden had lifted a hammer from the carpentry tools he used at his job and said to Tiatano "I ought to hit you with this," but stopped when James told him to "knock it off." Later Ogden started pulling Tiatano around by his shirt and telling him he hated him. Jeffries told Ogden to stop, and he did.
 
 
 9
 When James decided to leave the party, her van got stuck on a fish net laying on the ground. She and Jeffries were sitting in the van, when Jeffries heard Tiatano say "oh man" and fall down. Ogden had just punched Tiatano in the face, possibly with some object in his hand, so hard that he broke his nose and knocked him unconscious. Some other men who were there brought Tiatano into the house and gave him first aid. That incident led to Jeffries killing Ogden. Her testimony is worth reading:
 
 
 10
 Q. Now, when you heard that statement from your mother that Michas [Tiatano] had just gotten hit by David [Ogden], how did you feel?
 
 
 11
 A. Angry.
 
 
 12
 Q. What did you do?
 
 
 13
 A. I got out of the van and started chasing him.
 
 
 14
 Q. Why were you chasing David Ogden?
 
 
 15
 A. Because he hurt my boyfriend.
 
 
 16
 Q. What were you going to do if you got ahold of David Ogden?
 
 
 17
 A. Beat him up.
 
 
 18
 Q. Where did you chase him?
 
 
 19
 A. Around--I chased him to my Aunt Teresa's. And he went around on the road and I chased him down the road a little bit and then I came back.
 
 
 20
 Q. Were you able to catch him?
 
 
 21
 A. I got ahold of him once.Q. What happened?
 
 
 22
 A. He swung back, tried to hit me.
 
 
 23
 Q. Did he hit you?
 
 
 24
 A. No. He came close to, though.
 
 
 25
 Q. What happened next?
 
 
 26
 A. I let him go and he ran some more.
 
 
 27
 Q. Then what?
 
 
 28
 A. I ran after him.
 
 
 29
 Q. This was 29-year old man, is that correct?
 
 
 30
 A. Yeah.
 
 
 31
 Q. You were 14 at the time?
 
 
 32
 A. Yeah.
 
 
 33
 Q. Why were you trying to reach him?
 
 
 34
 A. I just answered your question.
 
 
 35
 Q. Weren't you afraid that he would harm you?
 
 
 36
 A. No.
 
 
 37
 . . . . .
 
 
 38
 A. No, I wasn't afraid of him.
 
 
 39
 Q. You were not afraid of him?
 
 
 40
 A. No.
 
 
 41
 . . . . .
 
 
 42
 Q. And at the end of the chase, what did you do?
 
 
 43
 A. I went over to my mom's side of the van.
 
 
 44
 Q. Was this on the driver's side?
 
 
 45
 A. Yeah.
 
 
 46
 Q. What happened next?
 
 
 47
 A. My mom had a gun out. She was loading it.
 
 
 48
 . . . . .
 
 
 49
 Q. When you got up to the van, what happened next?
 
 
 50
 A. She gave me the gun.
 
 
 51
 Q. Did you ask her for the gun?
 
 
 52
 A. No.
 
 
 53
 Q. Did she say anything to you when she handed you the gun?
 
 
 54
 A. Yes. She said it was on safety.
 
 
 55
 Q. What else did she say?
 
 
 56
 A. And this is how you click it off.
 
 
 57
 Q. And she showed you that?
 
 
 58
 A. Yeah.
 
 
 59
 Q. Where was David Ogden at this time?
 
 
 60
 A. He was still on the road.
 
 
 61
 . . . . .
 
 
 62
 Q. So what did you do with the gun?
 
 
 63
 A. I took it and started chasing him again.
 
 
 64
 Q. What did he do?
 
 
 65
 A. Run.
 
 
 66
 Q. What happened next?
 
 
 67
 A. I ran around the van and he stopped and put his arms up and I shot the gun.
 
 
 68
 Q. Can you show the jury what he did with his arms? How did he hold his arms?
 
 
 69
 A. Just up in the air.
 
 
 70
 Q. Can you demonstrate for the jury?
 
 
 71
 A. Like this.
 
 
 72
 Q. Jaylene, why did you shoot him?
 
 
 73
 A. Because I was angry.
 
 
 74
 . . . . .
 
 
 75
 Q. Why were you angry?
 
 
 76
 A. Because I didn't like him and he hurt somebody I loved.
 
 
 77
 Tr. of Sept. 12, 1995, at 71-77. Jeffries estimated that Ogden was about as far from her when she shot him as the jury rail was from the witness box where she was testifying, which she estimated to be about 20 feet.
 
 
 78
 On defense counsel's cross-examination, Jeffries conceded that perhaps Ogden was not really afraid of her, because he was not afraid of anyone when he was drunk, and if he had really wanted to, he could have beat her up and hurt her. She also testified, on cross, that her mother had bought the gun because of threats from one of Jeffries' previous boyfriends.
 
 
 79
 James, the mother, testified that after Ogden had "cold cocked" Tiatano, Jeffries chased him for awhile. According to James, the following ensued:
 
 
 80
 A. Jaylene [Jeffries] came--excuse me. Jaylene came back to the van and she was breathing heavy, like she was running. She was very upset and she just started begging me for the gun. She said, mom, please give me the gun, give me the gun. She said it several times.Q. And what did you do when she begged you for the gun?
 
 
 81
 A. I just grabbed for my purse and got the gun and handed it to her.
 
 
 82
 . . . . .
 
 
 83
 Q. At that moment when Jaylene asked you for the gun and you reached in and gave it to her, why did you give it to her?
 
 
 84
 A. I gave it to her to protect herself and the family members.
 
 
 85
 Q. What did you expect her to do with the gun when you gave it to her?
 
 
 86
 A. I just expected her to fend David off. I didn't want her to shoot him. It was just to scare him away from the property.
 
 
 87
 Q. Why did you want her to scare him away from the property?
 
 
 88
 A. Because I knew how violent he was and I knew that he wouldn't stop at just one punch and he wanted to continue being violent.
 
 
 89
 Tr. of Sept. 13, 1995, at 216-17. On cross-examination, James testified that as Jeffries was chasing Ogden, Jeffries "just yelled at him that she was going to get him." James denied showing her daughter how to turn the safety off so that the gun would fire.
 
 
 90
 Defense counsel argued self defense. The daughter's testimony that she was angry at Ogden, not scared of him, was of course no help to him. But he pointed out to the jury that the mother, his client, was charged with aiding and abetting the daughter by handing her the gun, so she had to be judged by what she knew at that moment, not by the daughter's conduct afterward in killing a man who had raised his hands in surrender. He argued that because the mother knew Ogden was drunk, vicious when drunk, and usually carried a knife in his sock, it was not grossly negligent to give "the gun to her daughter so that Jaylene could protect herself in that one moment when [the mother] had that decision, the split second decision to make."
 
 
 91
 The jury heard all the evidence discussed above. In the pretrial skirmishing, the court had ruled that James and Jeffries could testify about prior violent misconduct they had known about when James handed Jeffries the gun, but could not introduce extrinsic evidence they had not then known of. This appeal is about four exhibits that the mother's attorney was not allowed to show the jury. He had (1) court documents setting forth detailed findings on the robbery of a 58-year old man, in which Ogden sat on the man and held a knife at his throat, and also at his eyes while threatening to blind him; (2) a presentence report with 38 priors, some resulting in conviction, some with unknown dispositions; (3) a Seattle police report that on Second Avenue in Seattle near Pike Place Market Ogden, with his shirt off, was randomly striking people in a crowd; (4) another time, again near Pike Place Market, Ogden and another man grabbed a stranger, threw him down, beat him, and kicked him in the face.
 
 
 92
 The jury sent out a number of questions during its deliberations. One of them basically asked for the evidence that had been excluded:
 
 
 93
 Dear Judge,
 
 
 94
 The jury would like to know if it is a "fact" that:
 
 
 95
 1) Ogden did stab an "old man" and was sentenced to 20 yrs & on parole
 
 2) did he really stab someone with a pen
 
 96
 3) did he really murder a man and hide on an apt?
 
 
 97
 Are there police or court documents to prove this or is it "brag?"
 
 
 98
 Thanks.
 
 Robert Reedy
 Foreman
 
 99
 The judge declined to supplement the evidence.
 
 
 100
 The district judge further explained why he had excluded the evidence. In his ruling on defendant's motion for a new trial, he explained that "evidence of every past violent act by Ogden, known to the defendant, was placed before the jury," as was reputation and opinion evidence as to Ogden's violent character. The extrinsic evidence was not such evidence, because "the only relevant facts concerning Ogden's past were the ones defendant knew about; only to that extent could her state of mind at the time of the shooting have been affected by Ogden's past misconduct." The district judge noted that if the court records had in fact been to the contrary, and proved that Ogden had been exaggerating and was not really so violent as he claimed, the court would have sustained a defense objection, "because the court record, never seen by defendant, could not have affected her state of mind. The result should be no different when the defendant offers the extraneous record."
 
 ANALYSIS
 
 101
 James argues that she was entitled to introduce corroborating evidence of the victim's violent propensities under United States v. Pitts, 6 F.3d 1366 (9th Cir.1993). But Pitts is distinguishable. In that case, not a self defense case, the district court admitted evidence that the defendant had been arrested for possession of sawed off shotguns, because it corroborated a government witness's claim that she had bought them for him. No one was appealing exclusion of the evidence, so we had no occasion to decide whether it could have been excluded. We held only that the district court did not abuse its discretion by admitting the evidence, not that it had no choice but to admit it.
 
 
 102
 In United States v. Keiser, 57 F.3d 847 (9th Cir.1995), we held that the district court correctly excluded evidence that the shooting victim had, during the shooter's trial, threatened the shooter's brother in the courtroom corridor. We held that the evidence in that case would have been relevant to show the victim's propensity for violence, to support the defendant's claim that the victim was the aggressor, but we held that only reputation or opinion evidence could come in for that purpose, not evidence of specific acts. Id. at 853-55. Appellant argues that Keiser should be distinguished and was wrongly decided. We need not decide whether the extrinsic nature of the evidence required that it be kept out under Keiser, so we do not reach these issues.
 
 
 103
 What is critical to deciding the case before us is the standard of review, abuse of discretion. The judge's decision to exclude the evidence was reasonable, because materials the defendant had never seen could not have had a bearing on whether, when she gave her daughter the gun, she had a reasonable fear that the victim might be dangerous to her daughter. Had he admitted the evidence, his decision might have been reasonable because the documentary evidence of what a vicious fellow Ogden was would have had a bearing on whether James and her daughter were making up the whole story about his character.
 
 
 104
 There is some confusion between Pitts and Keiser about the standard of review, but the cases can be reconciled. Pitts says we review only for abuse of discretion. Pitts, 6 F.3d at 1370 (citation omitted). Abuse of discretion is the usual standard of review of rulings on admissibility of evidence. See, e.g., United States v. Hill, 953 F.2d 452, 455-56 (9th Cir.1991) (citing United States v. Conners, 825 F.2d 1384, 1390 (9th Cir.1987) and United States v. Alfonso, 759 F.2d 728, 739 (9th Cir.1985)). But Keiser says that even though we generally only review for abuse of discretion, the issues in that case were primarily matters of law, subject to de novo review. Keiser, 57 F.3d at 852 n. 6. As Keiser says, that is an exception to the general rule that prevails in this and most cases.
 
 
 105
 Except in rare cases, we do not really see a way to take discretion out of the decision on admissibility. There are several ways the jury might use evidence about the violent character of the victim. They might be trying to decide whether the defendant really feared for her life or the life of another. Or whether the fear was reasonable. Or whether the victim was the aggressor. Or the jurors might be deciding that the victim "needed killing." On the last, they are entitled to no evidence, because the proposition is illegitimate. The judge has to make a tough call about exactly what the evidence may tend to prove in the context of the particular case. The decision has to be made in the context of all the evidence, and what impression it appears to be making, not just how the lawyers argue it. The reason is that the jurors will be told to apply the instructions to the evidence, and the instructions will come from the judge, not the lawyers.
 
 
 106
 In a self defense case such as this one, the trial judge necessarily navigates between the error (not reversible, if it results in acquittal, but error nevertheless) of allowing the defendant to subvert the law by proving that the victim deserved killing, and the error of allowing the prosecution to subvert the defendant's rights by denying her a fair opportunity to prove self defense.[1] That risk did not exist in Pitts, because it was not a self defense case, but it was a serious risk in the case at bar.
 
 
 107
 The district judge reasonably concluded that because the issue appeared to be the reasonableness of the defendant's fear of violence, only what the defendant knew had any relevance. What a person does not know cannot affect her state of mind:
 
 
 108
 As the purpose there is to show the accused's state of mind, it is obvious that the deceased's character, as affecting the accused's apprehensions, must have become known to him, i.e., proof of the character must indispensably be accompanied by proof of its communication to the accused; else it is irrelevant.
 
 
 109
 IA Wigmore On Evidence § 63, at 1369. On the other hand, where the issue is who the aggressor was, the actual character of the deceased, though unknown to the defendant, is relevant to show the probability that the deceased was the aggressor. See United States v. Burks, 470 F.2d 432, 437 (D.C.Cir.1972); II Wigmore On Evidence § 246(1)(h), at 60-61. For example, even if the defendant does not know about a victim's gunfighting propensities, history of them affects the credibility of a defendant's claim that the victim was the aggressor:
 
 
 110
 "It is well and generally known that there are some violent and dangerous men in this country, who are in the habit of carrying pistols, belted behind them and in their pockets, who never think of fighting in any other way than with deadly weapons, who are expert in using them, and who, especially when intoxicated, bring on and press to the extreme of outrage their deadly encounters for causes and provocations that would be regarded as utterly trivial by peaceable men; and that if one of such persons, while engaged in an angry altercation, should suddenly step back and rapidly throw his hand behind him, it might readily be understood by those who saw it to mean that he was in the act of drawing a pistol to use it. The same act by one of the great mass of our peaceable citizens who are not in the habit of carrying weapons would suggest no such thought, and in such case the pistol would have to be drawn and exhibited before any such thing would be conceived, unless there had been some very extraordinary provocation."
 
 
 111
 II Wigmore at § 246(1)(a), at 51 (quoting Horbach v. State, 43 Tex. 242, 250 (1875)).
 
 
 112
 The neatness of these distinctions is illusory, because they depend on the false assumption that the purpose of the evidence can be known and unambiguous. The defendant's state of mind is likely to have been jumbled in many cases, so that even an entirely truthful person might not be able to say exactly what she was thinking in a heated moment. The lawyers may mean to introduce the evidence for one thing, and the jury may use it for another. In this case, had the police reports come in, some jurors might have used them to judge whether James and her daughter were making up what they said about Ogden's boasts of violence, while others used it to decide whether Ogden "needed killing." The jury's note suggests the possibility that at least one juror probably wanted the police reports to determine whether James and her daughter were lying about Ogden's boasts, but the judge had to decide whether to admit the evidence before the case went to the jury, and could not know what all the jurors were thinking even when the note was sent out. The illusory character of the distinctions about the purpose for which the evidence is admitted is critical to why review must be for abuse of discretion.
 
 
 113
 The prosecutor in this case did not try to present Ogden as other than the violent, vicious man he was. Had he done so, the door might have been opened to admissibility of additional evidence. In the circumstances of this case, the district judge was within his discretion in excluding as irrelevant the evidence the defense offered.
 
 
 114
 AFFIRMED.
 
 NOONAN, Circuit Judge, dissenting:
 
 115
 The opinion of the court very fairly sets out the facts and relevant testimony. Ernestine Audry James handed a gun to her 14-year-old daughter Jaylene with which Jaylene killed Ernestine's own boyfriend David Ogden. The most that Ernestine could be convicted of was gross negligence in giving the gun to her daughter. Her only defense was that she believed that her daughter and herself were in danger of grievous bodily harm or death from Ogden.
 
 
 116
 Essential to that defense was her belief in Ogden's stories of previous acts of vicious violence committed by him. These stories were of such a remarkable character of atrocity that one might doubt that he had told them of himself or doubt that they had really occurred. Hence the question raised by the jurors as to Ogden's stabbing of an old man; Ogden stabbing of another person with a pen; and Ogden murdering a man: "Are there police or court documents to prove this or is it 'brag'?"
 
 
 117
 For the defense the records, if admitted, would have had two legitimate functions: to corroborate Ernestine James's own testimony that she had heard Ogden tell her these things and to corroborate her statement that she had reason to be afraid of Ogden in his vicious drunken mood.
 
 
 118
 The district court thought the only function of the evidence would have been to show Ernestine James's state of mind and that, since she had not seen the records, the documents proved nothing as to her state of mind. That interpretation of the evidence was too narrow. It was absolutely necessary to her defense for the jury to believe (1) that she wasn't making up the stories and (2) that, when she heard them, she heard them from the man who had actually done these terrible things and who was not just spinning tales. The records proved that he had done them so that the stories of his wild exploits would have had the ring of truth to her, and the records proved that what Ernestine James testified to had actually been told her by the man himself. The records corroborated her testimony, and the records corroborated her reason to fear.
 
 
 119
 The risk of "prejudice" is usually one borne by the defendant in a criminal trial. The majority cites no case holding that the risk of prejudice to the victim is properly considered by the district court when deciding to admit or exclude evidence relevant to a claim of self-defense. This lack of authority is especially troubling here, where the victim is in a state beyond earthly judgment. If the victim does not suffer prejudice, who does? Admittedly the evidence aids the defense and so hurts the prosecution, but harm to the prosecution's case does not properly enter the discretionary judgment of the trial judge.
 
 
 120
 The law of this circuit is crystal-clear that corroboration of a key prosecution witness by the introduction of criminal records is permissible, even at the risk of some prejudice to the defendant on trial. United States v. Pitts, 6 F.3d 1366, 1370-71 (9th Cir.1993). We should not have one rule for the prosecution and another rule for the defense. My old law teacher, Austin Scott, used to ask the class, "Are you pro-plaintiff or pro-defendant?" For him the question was a kind of reductio ad absurdum--there was no way a good lawyer would come to a case with a preconception as to which side should be favored. But now we have a favorable rule for the prosecutor, an unfavorable rule for the defense. The distinction is not justified by saying that in each case we affirm a discretionary decision. The question we have to determine is whether evidence of this sort corroborating a principal witness is properly part of the case. The crucial significance of this kind of corroboration has been recognized in a leading opinion by Judge Skelly Wright, United States v. Burks, 470 F.2d 432, 434-35 (D.C.Cir.1972); 2 Wigmore, Evidence, §§ 246, 248 (Chadbourn rev.1979).
 
 
 121
 Self-defense is about as basic a moral and legal principle as there is. See George P. Fletcher, Self-Defense As A Justification for Punishment, 12 Cardozo L.Rev. 859, 859 (1991). A mother's instinct to preserve her child from danger is equally strong, equally a part of that bedrock nature we share with all animals. When Ernestine James was denied the opportunity to confirm her credibility on the central point of her defense, there was more than a discretionary ruling by the district court; there was denial of a right conferred by the Constitution. "[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636 (1986) (citations and internal quotations omitted). James did not have that opportunity that the Sixth Amendment assures.
 
 
 
 [1]
 We respectfully disagree with Judge Noonan's suggestion that there is something new about considering the risk of unfair prejudice in regard to self defense evidence. Rule 403 gives the district judge discretion to exclude relevant evidence because its probative value "is substantially outweighed by the danger of unfair prejudice." The rule is neutral as to which side proffers the evidence; it does not say "unfair prejudice to the defendant." "Unfair prejudice" means, at its most serious, "an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." McCormick on Evidence § 185 at n. 31 (2d ed.1972); see Fed.R.Evid. 403, 1972 Advisory Committee Note. While a defendant is fully entitled to prove self defense, a defendant is not entitled to persuade a jury by evidence "justifying the deliberate destruction by private hands of a detested malefactor." II Wigmore on Evidence § 246, at 57. It is for that reason that it has long been held that "the unconditional and indiscriminate admission of such evidence is dangerous." Id