# MARSHALL v. UNITED STATES.

CRIMINAL LAW;  EVIDENCE;  SELF-DEFENSE.

1. In a homicide case, a ruling of the trial court is not erroneous which sustains an objection by the prosecution to a question propounded by the accused to one of his witnesses as to whether a witness for the prosecution had stated she was going to testify as she did

---

NOTE.—On proof of self-defense necessary to warrant admission of evidence as to character and reputation of deceased, see note in 3 L.R.A. (N.S.) 355.

On right to set up self-defense in case of homicide in mutual combat voluntarily and willingly entered into, see note in 45 L.R.A.(N.S.) 646.

On the question of admissibility of evidence of turbulent and dangerous character of victim of assault or homicide on issue of self-defense, see note in L.R.A.1916A, 1245.

against the accused in order to protect her mother, when there is no evidence in the case that there was anything for the mother to be protected against, and nothing to show that the witness for the prosecution had made a statement at the time different from that she made as a witness.

2. Where the accused in a homicide case claims he acted in self-defense, and in response to the question whether he knew the deceased was a strong man, replies: "Yes, sure I knew he was strong. I knew how he did policemen,"—it is reversible error for the trial court, on the motion of the prosecution, to strike out the remark of the accused as to his knowledge of how the deceased "did" policemen (Chief Justice Shepard dissenting).

3. Where the defense in a homicide case is that the accused acted in self-defense, it is error for the trial court in his charge to the jury, in referring to the affray in which the deceased was killed, to say that it must appear that there was no reasonable occasion for the accused to escape from the conflict; the true test being whether the circumstances presented to the mind of the accused were such that they would have produced upon the mind of any reasonably prudent person, situated as the accused was at the time, a reason-. able belief that the deceased was then about to kill him or to do him, serious bodily harm. (Following *Sacrini* v. *United States*, 38 App. D. C. 371.) The right of a defendant when in imminent danger to take life does not depend upon whether there was an opportunity to escape. One under such circumstances is not compelled to step aside or flee.

No. 2932. Submitted October 3, 1916. Decided November 14, 1916.

HEARING on an appeal by the accused from a judgment of conviction of murder in the second degree of the Supreme Court of the District of Columbia in a prosecution for murder.

*Reversed.*

The facts are stated in the opinion.

Mr. *James A. O'Shea;* Mr. *A. W. Suelzer,* and Mr. *Charles Fahy,* for the appellant, in their brief cited:

*Adkins* v. *Com.* 82 S. W. 242; *State* v. *Adler,* 146 Mo. 18; *Allen* v. *United States,* 157 U. S. 675; *Allison* v. *United States,* 160 U. S. 203, 215; *Ayers* v. *Watson,* 113 U. S. 594, 609; *Bal-*

*timore & O. R. R. Co.* v. *Morgan,* 35 App. D. C. 196, 199; *State* v. *Bartlett,* 170 Mo. 658, 668, 669; *State* v. *Benham,* 23 Iowa, 154, 161; *People* v. *Betchelder,* 27 Cal. 69; *Boatwright* v. *State,* 89 Ga. 410; *Bohannon* v. *Com.* 71 Ky. 481, 485; *Boykin* v. *People,* 22 Colo. 496, 504, 505; *Bracken* v. *State,* 16 S. W. 192, 194; *Bradley* v. *State,* 31 Ind. 492, 504; *State* v. *Branstetter,* 65 Mo. 149; *People* v. *Buccufurri,* 143 N. Y. Supp. 62; *Bullock* v. *State,* 165 S. W. 196, 200; *State* v. *Cable,* 117 Mo. 380, 385; *State* v. *Cain,* 20 W. Va. 679, 703, *et seq.; Carpenter* v. *State,* 62 Ark. 286, 307; *Casner* v. *State,* (Tex.) 57 S. W. 821; *Childers* v. *State,* 30 Tex. Crim. Rep. 160; *Clare* v. *People,* 9 Colo. 122; *Coffin* v. *United States,* 156 U. S. 432, 462 et seq.; *Com.* v. *Colandro,* 231 Pa. 343; *Cornelius* v. *State,* 12 Ark. 782, 800; *Crawford* v. *United States,* 212 U. S. 183, 203; *Creek* v. *State,* 24 Ind. 151; *People* v. *Curtis,* 52 Mich. 616, 623; *District of Columbia* v. *Gray,* 1 App. D. C. 500, 506; *Dodson* v. *State* (Tex.) 70 S. W. 969, 971; *State* v. *Donnelly,* 69 Iowa, 705; *State* v. *Doris,* 51 Or. 136, 162, 164; *Dukes* v. *State,* 11 Ind. 557, 567; *Duncan* v. *State,* 49 Ark. 543, 547; 1 East, P. C. 233, Id. 271; *Elder* v. *State,* 69 Ark. 653; *Elliott* v. *People,* 22 Colo. 466, 467; *State* v. *Elliott,* 98 Mo. 150; *State* v. *Evans,* 124 Mo. 397; *Fields* v. *State,* 134 Ind. 46, 54; *Foutch* v. *State,* 95 Tenn. 711; *Fussell* v. *State,* 94 Ga. 78; *State* v. *Gartell,* 171 Mo. 516–519; *State* v. *Gordon,* 191 Mo. 114, 130, 131; *Gourko* v. *United States,* 153 U. S. 183, 190; *District of Columbia* v. *Gray,* 1 App. D. C. 500, 506; *Hammond* v. *People,* 199 Ill. 173, 182; *State* v. *Harmon,* 60 Atl. 866, 869; *People* v. *Harris,* 95 Mich. 84, 90; *Hash* v. *Com.* 88 Va. 172; *Kansas* v. *Hatch,* 57 Kan. 420, 424; *Herbert* v. *United States,* 2 H. & H. (D. C. ) 210; *Hicks* v. *State,* 51 Ind. 407; *State* v. *Hill,* 69 Mo. 451; *State* v. *Hill,* 20 N. C. 491, 495; *State* v. *Hough,* 138 N. C. 663; *Insurance Co.* v. *Foley,* 105 U. S. 350, 353; *Karr* v. *State,* 100 Ala. 416; *State* v. *Kennedy,* 1 N. C. 572; *State* v. *Kennedy,* 7 Nev. 374; *Kirk* v. *State,* 10 Okla. 61, 69; *Klein* v. *Russell,* 19 Wall. 433, 464; *State* v. *Knapp,* 45 N. H. 148; *Lanckton* v. *United States,* 18 App. D. C. 348, 368; *La Rue* v. *State,* 64 Ark. 144; *People*

v. *Lewis,* 117 Cal. 186, 190, *et seq.; People* v. *Lilly,* 38 Mich. 270; *Luby* v. *Com.* 12 Bush. 1; *People* v. *Macard,* 73 Mich. 15; *Magruder* v. *Montgomery,* 33 App. D. C. 133, 142; *McHugh* v. *State,* 31 Ala. 320; *Meuley* v. *State,* 26 Tex. App. 274, 305–307; *Miller* v. *State,* 74 Ind. 1, 6; *People* v. *Newcomer,* 118 Cal. 263, 271; *State* v. *Partlow,* 90 Mo. 608; *Pointer* v. *United States,* 151 U. S. 396, 414; *Pond* v. *People,* 4 Cooley (Mich.) 177; *Riley* v. *Com.* 95 Ky. 266, 269; *Ritchey* v. *People,* 23 Colo. 314, 319; *State* v. *Robertson,* 50 La. Ann. 92; *State* v. *Rolla,* 21 Mont. 582; *Rowe* v. *United States,* 164 U. S. 546, 566; *Runyan* v. *State,* 57 Ind. 80; *Sacrini* v. *United States,* 38 App. D. C. 371, 378; *State* v. *Sam,* 53 N. C. 150, 151; *Sams* v. *State,* 124 Ga. 25, 27; *Selfridge Case; Shell* v. *State,* 88 Ala. 14; *Smith* v. *United States,* 161 U. S. 85, 88; *State* v. *Starr,* 38 Mo. 271; *Steinmyer* v. *People,* 95 Ill. 383; *Stoffer* v. *State,* 15 Ohio St. 47; *Temple* v. *People,* 4 Lans. 119, 127; *Thompson* v. *United States,* 155 U. S. 271; *State* v. *Thompson,* 9 Iowa, 188, 192; *State* v. *Thompson,* 45 La. Ann. (2), 969; *People* v. *Thomson,* 145 Cal. 717, 721, 722; *Tilley* v. *State,* 24 Tex. App. 257, 272; *Tollett* v. *State* (Tex.) 55 S. W. 573, 575; *Iowa* v. *Tweedy,* 5 Iowa, 433, 437, 438; *State* v. *Zeigler,* 40 W. Va. 593, 606, 608; *Wall* v. *State,* 51 Ind. 453; *People* v. *Wasson,* 65 Cal. 538–540; *State* v. *Weiners,* 66 Mo. 13; *Wiggins* v. *United States,* 93 U. S. 465; *Willis* v. *Commonwealth* (Ky.) 63 S. W. 738, 739; *Wilson* v. *People,* 94 Ill. 299; 9 Am. & Eng. Enc. Law, p. 600; 25 Am. & Eng. Enc. Law, pp. 261, 262; Bishop, Crim. Law, sec. 6333; Id. 5th ed. sec. 871; Bishop, New Crim. Law, I. sec. 850; Bishop, Crim. Proc. sec. 1107; Id. secs. 609, 610; 4 Bl. Com. 201; Foster, C. L. p. 273; Starkie, Ev. II. 963; Whart. Crim. Law, Sec. 1019; Whart. Homicide, 3d ed., secs. 272, 301, 477 *et seq.,* pp. 442, 452; 473; 474, 482, *et seq.;* Wigmore, Ev. II. 940, 948.

*Mr. John E. Laskey,* United States District Attorney, and *Mabry C. Van Fleet,* Special Assistant, for the United States, in their brief cited:

*Chapman* v. *Capital Traction Co.* 37 App. D. C. 479, 493;

*De Forest* v. *United States,* 11 App. D. C. 458; *Hopkins* v. *United States,* 4 App. D. C. 430, 442; *Hughes* v. *Heyman,* 4 App. D. C. 444; *Lancklon* v. *United States,* 18 App. D. C. 348, 368; *McDermott* v. *Severe,* 202 U. S. 600, 610; *Pointer* v. *United States,* 151 U. S. 396, 414; Records and Briefs, Ct. App. D. C. Vol. 85, pages 61, 62; *Robinson* v. *Parker,* 11 App. D. C. 132; *Rowe* v. *United States,* 164 U. S. 546; *Sacrini* v. *United States,* 38 App. D. C. 371, 378; *Strather* v. *United States,* 13 App. D. C. 132; *Sweeney* v. *Erving,* 228 U. S. 233; *Walker Furniture Co.* v. *Dyson,* 32 App. D. C. 90, 92; *Washington Fire Ins. Co.* v. *Davison,* 30 Md. 92.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

George William Marshall, charged with the killing of one Edward Williams in the District of Columbia on February 6, 1915, was convicted of murder in the second degree and has appealed.

The evidence of the witness, Carrie Brooks, tended to show that a family consisting of Sarah Brooks, witness's mother, Dick Brooks, a brother, Emma Lewis, Marshall Thomas, and the deceased Williams, lived at 35 Fenton street, N. E.; that on February 5th witness saw the defendant and Eddy Williams, the deceased, in Selden's bar at First and Fenton streets, at 8:30 P. M.; they came to the house before 12 o'clock, both being drunk; at nearly 12 o'clock the defendant commenced arguing in the house, witness does not know what the fuss was about, but knows they were fussing; her mother said: "I ain't going to have this fussing in the house, you have got to get out;" witness told the deceased to stop too, but he was arguing, and defendant said to witness's mother, "God damn you," and witness said to defendant, "Don't cuss my mother, because I will put you out myself;" that Williams, the deceased, helped witness but that her mother pushed him, Williams, down in the chair and told him to keep quiet; witness then put him out and pushed the door shut; that he came back and told witness

to open it, but witness would not open it; that he then went around back and got on the back shed and came to the kitchen; and that he then got over the woodshed.

The following questions and answers followed:

Q. And then after he got in the back yard, when next did you see him?

A. I seen him the last brick he threw at Eddy Williams, I seen him in the door, the lights was so I could see him then.

Q. Did he come into the kitchen?

A. He came into the kitchen, and stood back there, stood back in the dark, and threw the brick, the first two.

Q. He stood back in the dining room in the dark?

A. We were in the front room, and when he threw the first brick Eddy had his back turned, and it struck him some place, and he started to jump up, and the defendant threw another brick that struck Williams, and the last brick, which broke my mother's lamp, all to pieces, struck him.

Williams fell right at the front door; after the third brick was thrown, defendant ran out the back door, and witness's brother came down the steps and asked what was the trouble; that the officer came in the patrol wagon and got Williams, but witness was not there; that at the time of the brick throwing witness's mother was beside the stove in the corner, and when deceased came back from the hospital he lay there on the couch until the doctors came and got him about 8 o'clock Sunday night. She further stated that deceased and defendant were not quarreling when they came into her mother's house; they had been there a good while when the quarrel started; witness does not know where defendant was when he threw the second brick, but when he threw the third brick he came into the door so she could see him; witness did not see defendant go out or come in, but knows he went out because she went straight back there; that the back gate was locked and witness did not see her mother go out after the trouble, pick up some bricks and bring them in.

Testimony of physicians from the hospital where Williams had been treated was to the effect that his skull was fractured,

and his death was caused thereby; that a man receiving such an injury might die in a very short space of time or live a number of days, depending upon the size of the blood vessel ruptured in the brain.

James Brooks, witness for the government, testified that he lived at 35 Fenton street at the time of the trouble, and that on that night he came home from the market a little after 11 and went to bed upstairs in the front room; that he heard the noise downstairs, and came down and saw deceased lying on the floor at the front door.

On cross-examination witness testified that witness's mother, Sarah Brooks, and Carrie Brooks, were at the time in the front room downstairs; that there was no quarrel and witness did not knock the defendant down; saw only one brick, and that was lying close by Eddy Williams. When he said he had been struck with a brick, I looked around and saw one brick laying there close down by his head. Witness does not know whether Smithy and George Harvey were there, but that he did not think he, Harvey, was, because he did not see any other men in the house except the ones that lived there.

Emma Lewis testified that she lived during the month at 35 Fenton street, and was upstairs asleep at the time of the trouble; that Sarah Brooks called her down and told her what had happened, and witness saw Eddy Williams lying on the floor, bleeding from the head; witness saw bricks lying on the floor and broken lamp; witness was there when the officers came and took him away. She did not know where the brick came from; did not know what happened; witness roomed there and Williams roomed there.

Officer Holmes of the police force testified that he went to 35 Fenton street, N. E., and found Eddy Williams bleeding; witness put him in the patrol wagon and took him to the Homeo-pathic Hospital; that Williams was treated there, and the wagon went back to the station house while they were treating him; witness identifies three bricks as bricks which were lying on the floor where Williams was; witness fitted the bricks down where they came from the sidewalk in front of the house; that it was

about half after 2 A. M. as well as he remembers; deceased walked away from the hospital towards home.

. Louisa Bradford testified in behalf of the defense that defendant lived at her house 47 F street, at the time in question; that the sleeve of defendant's sweater was cut when he came in; that defendant had a good reputation for peace and order.

Defendant testified in his own behalf as follows: That on the night of February 6th he went up to this house in the afternoon; that when he got there about eight or nine different fellows were there; about 7 or 8 o'clock Dick Brooks started a crap game upstairs, that they all went up and were shooting craps, a little disturbance came into the game, and Sarah Brooks hollered, "Break up the crap game before the police come;" later, witness and several others came downstairs, and while down the deceased and Smithy came in; that witness had loaned Sarah Brooks 25 cents the early part of the night, she saying that when Eddy Williams came she was going to give it to defendant; when Williams came in defendant put him in mind of it, and Williams spoke up and says, "What business have you giving Sarah Brooks money, you must be going with Sarah Brooks;" that witness says, "No, I ain't;" Williams says, "You must, you giving her money; who told you to come here anyhow?" Witness said, "Well, she gave me the privilege to come to the house;" one word brought on another and they started to fuss; Eddy Williams struck the defendant and knocked him down over the table; all made a rush to fight the defendant who got up, and deceased cut at him, cut him twice; Dick Brooks knocked defendant out of the door, and when defendant was going out of the door he fell; District had been working there cutting a sewer, and there were rocks about the size of defendant's fist, and defendant picked up one of these and, as Williams came out of the door, defendant threw this rock at him and hit him; that all came out and defendant ran home; that deceased weighed about 200 pounds; that when he came out of the door just before defendant struck him he had a knife in his hand still, and said he would cut defendant's heart out if he could

get to him, "and I picked up a stone and struck him with it;" deceased was not so tall, but was heavily built.

Thereupon the following ensued:

Q. Did you know whether he was a strong man or not?

A. Yes, sure, I knew he was strong.   I knew how he did policemen.

Objection was made to the remark how he did policemen, and it was stricken out by the court, to which defendant excepted. That he did not pick up any bricks in front of the house and carry them around to the back, that he had never been back in the alley there, and all he threw was a rock; that they were all in the front room drinking; that deceased and Smithy had brought a gallon of whisky in and put it up in half-pint bottles.

On cross-examination defendant testified that he knew Williams had Sarah Brooks as his friend; that the reason Williams did not cut defendant while he was lying down in the room was some of the others kept him from doing it; Sarah Brooks kept hold of his coat and pulled him back; Dick Brooks and the others were fighting defendant; that when he got up Dick Brooks knocked him down; "when I got to the door Dick Brooks hit me somewhere in the back and knocked me somewhere out the door;" defendant grabbed the stone when he was getting up; when he hit Williams the latter was getting to him in the street; when he knocked witness on the curb he knocked him face foremost, and when defendant got up he got up with the stone in his hand; "he made for me, all three of them made for me, when I went on right on side the curb, I did not go on the pavement, I just went up right side the curb, got back as much as I could, and then Williams allowed what he would do. Said he knew it was a stone, if he had stopped to get a brick guessed he would have been killed; that Dick Brooks came out with a razor and defendant went on his way as soon as he got up.

Maria White, a witness on behalf of the defendant, offered evidence tending to prove that she lived next door to 35 Fenton street; that witness heard a rumbling, raised a window and

looked out and saw Carrie and Eddy put George out of doors, and that when Carrie and Eddy put George out George said, "I ain't going against you all;" he says, "I ain't done to you all;" that Carrie talked to defendant awhile, "and then George stood there at the door a while and then went back into the house, and when he stooped down, out at the door, Dick knocked George down, and when George got up George crossed the alley and stood up there with his hands in his pockets;" that Eddy Williams said to George, "If you come back here you —— of a ——, I am going to kill you;" then Carrie came out at the door and picked up a brick and says she was going to knock the son of a bitch in the head; then Eddy turned around and told her to come in the house." In answer to the court, witness said she did not see George do anything; that she saw Sarah Brooks come out of the door and pick up two bricks in her right hand and one in her left, and carry them back into the house, and said she was going to have the sucker's neck broke. She did not see George come back, George was standing up the alley.

Addie Green, a witness on behalf of the defendant, testified that she knew the defendant, and that his reputation for peace and good order among those who knew him was good; that she knew Eddy Williams, and that his reputation was that he was a fighting man.

The first assignment of error is founded on the following exception: Carrie Brooks, witness for the prosecution, was asked if she did not state to Denia Jones on the Friday before the trial that the reason you are testifying as you did was to protect your mother. The witness said, "No," and thereupon the following ensued:

Q. "Is there anything there from which your mother should need protection?"

She replied, "Of course after George Marshall got up and said what he did, it was right for me to take up for her, because she didn't have no husband."

The court stopped the further inquiry because of the irrelevancy of the question.

Denia Jones, called as a witness for the defendant, was asked the following question:

Q. "Last Friday in the court house did Carrie Brooks say to you that the reason she was going to testify as she did against George was to protect her mother?"  "Yes," she said.  Objection was made by the prosecution, and the court ruled that it was an irrelevant proposition.  There is no evidence in the case that there was anything for the mother to be protected against.  Defendant's exception was noted.

There was no error in this, the question did not seek to elicit the fact that Carrie Brooks had made a statement at the time which was different from that made as a witness.  We think the court was right in holding the question irrelevant.

The second assignment of error is founded on this exception:

Defendant, who was testifying to striking the deceased in self-defense, was asked the following question:

Q. Did you know whether he was a strong man or not?

A. Yes, sure, I knew he was strong.  I knew how he did policemen.

The prosecution objected.  The court sustained the objection, and would not permit the defendant to answer relating what he knew deceased had done to policemen.  Exception was taken.

The majority of the court is of the opinion that the exclusion of this evidence was error.  Cases cited on behalf of the appellant sustain the proposition that it is proper to give incidents or specific acts of violence within the knowledge of the witness, or coming under his own observation.  See *People* v. *Harris,* 95 Mich. 87, 54 N. W. 648; *Dodson* v. *State,* 44 Tex. Crim. Rep. 200, 70 S. W. 969.

The writer differs from this view.  He believes that testimony relating to specific acts of violence creates a collateral issue about which there may or may not be dispute.  His opinion is that this testimony should be confined to the reputation of the deceased for cruelty and violence.

The third assignment of error relates to the exclusion by the court of certain instructions asked by the defendant relating

to testimony of his acting in self-defense, and also to the charge of the court, which, referring to the affray in which the parties were engaged, informed the jury that it must appear that there was no reasonable occasion for the defendant to escape from the conflict. This was error.

The question was whether, from the character of the deceased and his action at the time, defendant could reasonably infer or believe that he was in danger of his life, or of serious bodily harm. The true test for the application of the jury is whether the circumstances presented to the mind of the defendant were such that they would have produced upon the mind of any reasonable, prudent person, situated as the defendant was at the time, the reasonable belief that the deceased was then about to kill him, or to do him serious bodily harm. *Sacrini* v. *United States,* 38 App. D. C. 371, 378; *Beard* v. *United States,* 158 U. S. 550, 563, 39 L. ed. 1086, 1091, 15 Sup. Ct. Rep. 962, 9 Am. Crim. Rep. 324; *Rowe* v. *United States,* 164 U. S. 546, 41 L. ed. 547, 17 Sup. Ct. Rep. 172.

The right of a defendant when in imminent danger to take life does not depend upon whether there was an opportunity to escape. One under such circumstances is not compelled to step aside, or to flee.

For these errors, the judgment is reversed, and the cause remanded for a new trial.                    *Reversed and remanded.*