**UNITED STATES of America**

v.

**James TAYLOR, Appellant.**

No. 73–2275.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 27, 1974.

Decided April 7, 1975.

Supplemental Opinion April 24, 1975.

Rehearing En Banc Denied Aug. 4, 1975.

See 516 F.2d 1243.

Martin D. Minsker, Washington, D. C. (appointed by this Court), for appellant.

David N. Addis, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, James F. McMullin and Roger M. Adelman, Asst. U. S. Attys., were on the brief for appellee.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and JUS-

TICE,[*] United States District Judge for the Eastern District of Texas.

Opinion for the Court filed by Senior Circuit Judge FAHY.

FAHY, Senior Circuit Judge:

On a two-count indictment for murder in the first degree (22 D.C.Code § 2401), and carrying a dangerous weapon (22 D.C.Code § 3204), appellant was convicted of second degree murder[1] and the weapons charge. There are three questions he presses which warrant discussion: firstly, that the evidence was not sufficient to support a verdict of second degree murder; secondly, that the instruction on self-defense imposed upon appellant an erroneous obligation to retreat; thirdly, that the portion of the bifurcated trial devoted to the issue of mental responsibility should be set aside due to the circumstances and manner in which that issue was submitted to the jury. We do not find reversible error in the two respects directed to the "guilt" phase of the trial. As to the third contention, however, we agree that the verdict rendered on the second phase of the bifurcated trial—devoted to the issue of mental responsibility—should be set aside and that phase of the case remanded.

## I

We outline the factual situation sufficiently to give understanding to our decision that we find no reversible error in the conduct of the "guilt" or first phase of the trial.

There was evidence to the following effect: near midnight on November 7, 1970, outside the United House of Prayer in this City, appellant became involved in an argument with one Eddy Black, also known as Eddy Wallace. The altercation began at the doorway leading from the church cafeteria to an outdoor patio. Mr. Black was seen physically assaulting his female companion, described at trial as Mr. Black's common-law wife, with some testimony she was appellant's grandmother, although this relationship was not clearly established. A friend of appellant, William Hainesworth, testified that appellant had drawn a gun. Hainesworth talked to him and appellant dropped the gun to his side. Mr. Black ran back into the cafeteria. At about this time a shot was fired in appellant's direction by someone across the cafeteria from where appellant and Hainesworth were standing. It came from the vicinity of a group of people, and the identity of the one who fired it was never established. Following the shot appellant ran after Mr. Black through the cafeteria into the church building, pursued in turn by William Barber, the deceased, who was a special police officer employed by the church. During the chase appellant had a gun in his hand and fired one shot at Mr. Black. Deceased's gun remained in its holster until just before the abrupt end of the brief pursuit. Mr. Black left the church through a street door, with appellant close behind and the deceased close behind appellant. The deceased came through the door as appellant, who had turned to face him, stood on the steps leading from the door. At a distance of about ten feet appellant fired at deceased "point blank" according to a witness. After the first shot deceased cried out, "I'm hit." Appellant, according to the witness, fired two more shots. From evidence of gunpowder residue, one of these shots was fired approximately two inches from deceased's back.[2] The first shot caused a wound in the abdomen which was mortal.

There was a bullet hole in appellant's shoe, and reliable testimony that it was caused by a bullet from deceased's gun; but at what point it was fired does not appear. An uninvolved eyewitness to

---

[*] Sitting by designation pursuant to 28 U.S.C. § 292(d).

[1.] The trial court had ordered a retyped indictment for second-degree murder to be submitted to the jury following a ruling that there was insufficient evidence of premeditation to support a charge of first degree.

[2.] The second bullet entered the left shoulder and fractured deceased's spine.

the shooting, a friend of appellant, testified that appellant fired first, and that he did not see deceased fire at all. The only other disinterested witness to the shooting said deceased in running did not have his gun out but was trying to take it out, and when he was first shot he had not gotten it out.

Appellant was arrested near the church by a Metropolitan Police Officer. After his indictment on December 30, 1970, by order of the District Court of January 26, 1971, he was committed to St. Elizabeths Hospital for a sixty-day period to determine his competency to stand trial (24 D.C.Code § 301(a) ). On April 14 following he was found incompetent for that purpose after a report by the Medical Staff Conference at St. Elizabeths. There was ascribed to appellant by the report a mental disease diagnosed as "Adjustment Reaction of Adult Life, With Psychotic Reaction (Ganser's Syndrome)". Appellant remained at St. Elizabeths Hospital for nearly two years, until March 8, 1973, when the District Court was notified by the Hospital that appellant was then competent to stand trial. The trial now under review ensued.

## II

■ 1. We think the evidence was sufficient to support the verdict of second degree murder and of carrying a dangerous weapon, considered apart from the issue of mental responsibility. As to the offense of carrying a dangerous weapon there can be no dispute. As to the homicide, the testimony of the two uninvolved eyewitnesses, as well as that of another witness, makes clear that appellant was pursuing Black, armed with a handgun. The circumstances of record permit no rational conclusion other than that appellant was threatening Black with serious bodily injury, and, also, that appellant was aware of being followed by deceased. Upon running out an open door appellant turned and shot this uniformed officer, mortally wounding him. The evidence clearly did not require the jury to find it was in self-defense, or that any element of second degree murder was lacking, that is, that the homicide was without malice aforethought, or came within any of the exceptions enumerated in the definition of second degree murder. 22 D.C. Code § 2403.[3]

2. Appellant contends there was imposed upon him an erroneous obligation to retreat by the following language of the court's instructions to the jury:

Before a person can avail himself of the plea of self defense, he must do everything in his power consistent with his safety to avoid the danger and avoid the necessity of taking life. If one has reason to believe that he will be attacked in a manner which threatens him with bodily injury, he must avoid the attack if it is possible to do so; and the right of self defense does not arise until he has done everything in his power to prevent its necessity. In other words, no necessity for killing an assailant can exist so long as there is a safe way open to escape the conflict.

This statement of the law had been approved by this court in United States v. Peterson, 157 U.S.App.D.C. 219, 483 F.2d 1222, 1231, cert. denied, 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973), upon the basis of the earlier decision in Laney v. United States, 54 U.S.App.D.C. 52, 294 F. 412 (1923). The Laney opinion, however, also contains the following qualification of the duty to retreat:

We are aware of the wide diversity of opinion as to the duty to retreat, but this difference arises from the circumstances of the particular case under consideration, rather than from any difference of conception as to the

---

**3.** 22 D.C. Code § 2403 provides as follows:
Whoever with malice aforethought, except as provided in sections 22–2401, 22–2402, kills another, is guilty of murder in the second degree.

Sections 22–2401 and 22–2402 define the several manners in which one's conduct constitutes murder in the first degree.

rule itself. Time, place, and conditions may create a situation which would clearly justify a modification of the rule. For example, the common-law rule, which required the assailed to retreat to the wall, had its origin before the general introduction of firearms. If a *person is threatened with death or great bodily harm by an assailant, armed with a modern rifle, in open space, away from safety, it would be ridiculous to require him to retreat. Indeed, to retreat would be to invite almost certain death.*

Nor is one required to retreat when he is assailed in a place where he has a right to be, unless by so doing an affray can be clearly avoided. He may stand upon his rights, and resist the attack to the extent apparently necessary to avoid death or great bodily harm.[4]

54 U.S.App.D.C. at 58–9, 294 F. at 414–415.

We need not embark upon an extended discussion of the elements of self-defense in the variety of factual situations in which it may be claimed, or agree that the part of the *Peterson* opinion upon which the challenged instruction rests is altogether consistent internally, or states the duty to retreat in all circumstances. It is possible to read the instruction as somewhat ambiguous in requiring one who is threatened to "do everything in his power consistent with his safety to avoid the danger" and at the same time obligating him to "avoid the attack if it is possible to do so." Such a reading, however, affords no help to appellant, as we now explain. Our court in *Peterson, supra,* in a respect important to the present case, also holds as follows:

The right of homicidal self-defense is granted only to those free from fault in the difficulty; it is denied to slayers who incite the fatal attack, encourage

the fatal quarrel or otherwise promote the necessitous occasion for taking life. . . . In sum, one who is the aggressor in a conflict culminating in death cannot invoke the necessities of self-preservation. Only in the event that he communicates to his adversary his intent to withdraw and in good faith attempts to do so is he restored to his right of self-defense. (Footnotes omitted.)

483 F.2d at 1231.

■ Appellant was in no better position than an aggressor. The deceased, in the uniform of an officer of the law, with his pistol in its holster, was following appellant because appellant, with pistol in his hand, was pursuing Black. There was no reasonable inference to be drawn by the jury that the deceased had any other reason to enter the pursuit. It is not suggested he was unlawfully engaged, and there was no rational basis in the evidence for appellant to have feared serious bodily harm at the hands of the deceased if appellant would abandon his pursuit of Black. Appellant did not testify, and the evidence adduced did not justify an inference that when he turned toward the deceased, pistol in hand, the immediate situation created in his mind a belief that he was then threatened by deceased with death or serious bodily harm. Moreover, in the circumstances he could not then stand his ground and mortally wound the deceased; for the situation between them was of his own creation and placed him under obligation to indicate withdrawal from or abatement of the confrontation. Not having done so, the instruction of which he complains cast no greater burden upon him than was his duty under the law.

### III

As to the issue of mental responsibility we are seriously troubled. Appellant

---

4. See, for example, the rule as stated in 1916 in Marshall v. United States, 45 App.D.C. 373, 384:

The right of a defendant when in imminent danger to take life does not depend

upon whether there was an opportunity to escape. One under such circumstances is not compelled to step aside, or to flee.

moved for a bifurcated trial with two juries. Counsel explained:

> . . . this is a case in which the defense intends to mount a strong defense both on the facts and on the question of insanity. The defense in this case will be self-defense, and I think there is a clear claim on that. And the problem is that I am put in the position of arguing before the same set of jurors that he acted reasonably in doing what he did to protect himself, and five minutes later arguing to them that he was irrational.
>
> . . .

This position of the defense was not decisive of the subject but pointed to a material factor bearing on the exercise by the court of its discretion. The answer of the prosecution that the evidence would not support self-defense did not solve the problem.

1. The judge, in granting a bifurcated trial, stated he would make a determination as to which jury would hear the issue of mental responsibility after he had heard the evidence as to what occurred. When the factual presentation, which we have outlined in Part I, was completed, and the verdict of guilty on the first phase of the bifurcated trial rendered, defense counsel called attention to his motion for another jury, stating,

> . . . [M]y fear is that the jury is going to feel that I am asking them for two bites at the apple; that somehow it is immaterial for me to be in here arguing, that they just convicted him yesterday and now they ought to turn around and acquit him today, the same jury.

At that point the transcript continues as follows:

> That's the theory of bifurcation. I don't think they will have that view. I think it can be made perfectly clear to them in the instructions that this is the established right of the defense, to raise this question, and now is the time to raise it.

■ On the basis of these last remarks in the transcript, attributed to defense counsel, the United States contends that counsel waived his claim of right to a separate jury. In response, present counsel for appellant advises us as follows:

> Appellant's present counsel in this Court has been informed by appellant's counsel below that it is his clear recollection that the . . . portions of this passage [quoted above] were spoken by the trial judge and incorrectly attributed to him by the court reporter.[4] An appropriate mo-
>
> [4]This information was communicated to Government counsel on September 27, 1974 (after the Government filed and served its brief.)
>
> tion or stipulation to correct this error pursuant to Rule 10(e) of the Federal Rules of Appellate Procedure will be filed.

(Reply Br., p. 7.)

We have received no stipulation or motion but we have satisfied ourselves that there is at least such confusion in the transcript as to preclude this court from holding trial counsel waived his request for a separate jury. We now explain.

At the point following the last quotation above copied from the transcript it continues as follows:

> [The Assistant United States Attorney]: The only problem I have with that, and I really don't have any problem with bifurcation. I remember one case in which I refused to bifurcate. It was reversed. The psychiatrist in that case came right out and simply, by way of showing the ability to understand the nature of the offense, he said, "Well, I talked the details of the offense over with the defendant. He understood completely what was done," and that was clearly prejudicial, and his testimony should have been at the second stage of the game. That was my case.
>
> Was that Bennett, Your Honor?
>
> THE COURT: That was Bennett.

It thus appears that instead of the Assistant United States Attorney it was the judge speaking of a case in which he had refused to order a bifurcated trial.

The judge who presided over appellant's trial presided over the *Bennett* trial. The Assistant United States Attorney, to whom the transcript attributes the statement, does not appear of record in the *Bennett* case in either this court or the District Court. It seems clear that what the transcript attributes to him was a continuation of the statement of the judge. Moreover, the sequence in the transcript also indicates that it was the judge who was speaking, not the Assistant United States Attorney, up to the question, "Was that Bennett, Your Honor?" To which the court answered: "That was Bennett."

The apparent misattributions referred to preclude us from holding that appellant waived his claim of right to a different jury to consider his defense of insanity. We therefore consider the merits of the question as it arises in this case.

2. This court has recognized the desirability in a bifurcated trial of a second jury to hear an insanity defense if this appears necessary to eliminate prejudice. Holmes v. United States, 124 U.S.App.D.C. 152, 363 F.2d 281, 283 (1966); Parman v. United States, 130 U.S.App.D.C. 188, 399 F.2d 559, 562 (1968), cert. denied, 393 U.S. 858, 89 S.Ct. 109, 21 L.Ed.2d 126 (1968). Appellant's claim that the likelihood of prejudice was sufficient to require separate juries has substance. It was well stated by his counsel when he moved for a bifurcated trial with two separate juries. *Supra* 167 U.S.App.D.C. p. ——, 510 F.2d p. 1288. During the development of the insanity defense, if the trial of that phase of the case were not by a separate jury, jurors would be aware that appellant was contending that his killing of Barber was due to a rational belief it was necessary because Barber threatened him with serious bodily harm, a contention inconsistent with his claim of irrationality in support of his insanity defense.

3. We are troubled also by prejudice lurking in the form of written verdict submitted to and used by the jury. It reads as follows:

*Verdict Sheet*

We adhere to the decision previously reached, namely, that defendant is guilty of second degree murder and carrying a dangerous weapon.

We find the defendant not guilty by reason of insanity.

One aim of a bifurcated trial is to disassociate as far as possible from the issue of mental responsibility those factual elements of the accused's conduct which are irrelevant to that issue. For a jury which sits during both phases of a bifurcated trial, this is a difficult task in most cases. We know it was a difficult task for the jury in this case. After deliberating 4 hours, with an overnight interlude, the jury reported to the court inability to agree as to appellant's mental responsibility.[5] The court thereupon repeated to the jury in full his instructions, as a possible aid in their further deliberations. Some 4 hours later the jury rendered their verdict adhering "to the decision previously reached, namely, that defendant is guilty of second degree murder and carrying a dangerous weapon," with the second part of the form of the verdict stricken.

To adhere to the decision previously reached is to adhere to a decision reached without regard to the insanity defense. True it is that the alternative available on the form, "we find the defendant not guilty by reason of insanity," is intended to draw the jury's attention to the insanity issue alone, but to submit the matter to the same jury in the form used may have created a subtle though unintended danger of influencing the jury, or some of its members, to resolve their doubts by adhering to the previous verdict. The association of the language of the form with that verdict brought into the deliberations of the same jury on the insanity issue an element which was opposed to the objective

---

**5.** We note that between the indicted conduct and trial appellant had remained at St. Elizabeths Hospital 27 months before the hospital reported to the court that he was sufficiently recovered to be considered competent to be tried.

of disassociation sought by a bifurcated trial—and by the empanelling of a separate jury. The determination of criminal responsibility should be made in terms of responsibility or non-responsibility. The form used here tends somewhat to confuse the two distinct issues of a bifurcated trial. The issues should be separated in form in order to be certain that they are not intertwined in substance.

4. In presenting the case to the jury at the end of the trial's "insanity" phase, the prosecution reached the subject whether appellant had substantial capacity to conform his behavior to the requirements of law.[6] He called the jury's attention to the fact, shortly after the shooting, that when the Metropolitan Police Officer ordered appellant, who was running, to stop, he stopped. Thus, the prosecutor said, appellant conformed his "behavior to the requirements of the law." Such an argument on the issue of mental responsibility for crime runs counter to the statement of this court in United States v. Brawner, 153 U.S.App. D.C. 1, 23, 471 F.2d 969, 991 (1972):

> The question is not properly put in terms of whether he would have capacity to conform in some untypical restraining situation—as with an attendant or policeman at his elbow. The issue is whether he was able to conform in the unstructured condition of life in an open society, and whether the result of his abnormal mental condition was a lack of substantial internal controls. These matters are brought out in the ALI's comments to § 4.01 of the Model Penal Code Tentative Draft # 4 p. 158:
>
> > The schizophrenic . . . is disoriented from reality; the disorientation is extreme; but it is rarely total. Most psychotics will respond to a command of someone in authority within the mental hospital; they thus have some capacity to conform to a norm. But this is very different from the question whether they have the capacity to conform to requirements that are not thus immediately symbolized by an attendant or policeman at the elbow. Nothing makes the inquiry into responsibility more unreal for the psychiatrist than limitation of the issue to some ultimate extreme of total incapacity, when clinical experience reveals only a graded scale with marks along the way.

No doubt these views of the subject had not come to the attention of the prosecutor or of defense counsel, for the latter did not object, and we do not think the former was knowledgeably departing from a position this court had recently taken. Nevertheless, especially since this case was apparently a close one for the members of the jury, see 167 U.S.App.D.C. p. ——, 510 F.2d p. 1289, *supra,* they could well have been prejudicially misled by the prosecutor's statement.

5. Appellant called, as his chief witness, a psychiatrist on the staff of St. Elizabeths who had treated appellant during his stay there. The psychiatrist testified that in his opinion appellant was suffering from a mental illness on November 7, 1970, and from his knowledge of what occurred appellant was not able to control his conduct on that day. He testified appellant was then suffering from schizophrenia, chronic undifferentiated type, which he explained as a major mental illness spoken of as a psychosis in which the person is out of touch with what is going on around him:

> It involves his whole life. He doesn't really have an identity as a person. He doesn't really know who he is. He doesn't have a role in life. It interferes with his thinking process. They may be completely disorganized, slightly disorganized, or completely disorganized. They have confusion, and they often have, which is more obvious to be observed, delusions or hallucinations.

During the doctor's direct examination he testified that appellant had engaged

---

**6.** A key element of the defense of insanity is whether the defendant has substantial capacity to conform his conduct "to the requirements of law." United States v. Brawner, 153 U.S.App.D.C. 1, 471 F.2d 969, 990 (1972).

in art work or painting while in the hospital. Some examples had been examined by the doctor. He explained at trial that a patient's art work sometimes is helpful to learn about people and, also, as therapy—that it is in a field of psychiatry. Some of appellant's paintings he said "looked ill", describing them as follows:

. . . one was of a person without any genitals, that had large breasts but masculine arms, muscular masculine arms and feminine hips. One was without a head and one was just half a face which he calls a dimensional profile. Actually, it's not a profile; t's just half a head.

\*   \*   \*   \*   \*   \*

A   Then one was green faced with red eyes and one was a suspended black head, just suspended in space without any neck or body. Another one had two different sides, and I thought it was supposed to represent the devil. I thought it was rather gruesome to look at, and I can't picture it now. But I made a few notes on what I saw. But I distinctly remember it because I thought it was gruesome, and there were snakes in the picture.

Q   Doctor, could you say from your experience what message you got from looking at these paintings, if any?

A   Well, I think they are typical of schizophrenic art.

■■■ Appellant's counsel objected to the course of the cross-examination which followed, which we shall consider shortly. The trial judge ruled that defense counsel had opened the door to cross-examination about this diagnostic technique. We agree; but in the course of the cross-examination we think certain unfair elements were injected into the proceedings, as we shall now describe. Copies of paintings of well-known artists, Picasso, El Greco, Braque, Gauguin, Nolde and Klee, were exhibited to the witness and the jury. The witness was asked whether, on the basis of distortions in these paintings and their bizarre nature, he could diagnose the artist as suffering from mental illness. For example, the doctor was shown El Greco's "Laocoon", with its snakes and distorted figures, and asked if to his knowledge El Greco suffered schizophrenia, chronic undifferentiated type. This was the illness the witness had ascribed to appellant. He replied that he did not know enough about El Greco to state, but that there were morbid things about the painting. The difficulty we have with this examination is that the mental condition of these artists was not the issue being tried. The question for the jury was far different. And the question as to the witness' testimony was simply whether the paintings of appellant to which he referred could have aided him in diagnosing appellant's mental condition. His opinion as to that condition was not by any means based entirely upon appellant's paintings.

■■■ Another aspect of the cross-examination added unfairness to the procedure we are now examining. The testifying psychiatrist several times distinguished between what he saw in appellant's paintings and in the copies shown him of the works of the great artists. While acknowledging the existence of bizarre elements in those works he insisted he did not "see quite the things that [he] was seeing in the patient's drawings", and stated that while psychiatrists might have no business interpreting the great artists, "we do use this method with our patients, and we have known from experience that schizophrenic patients do certain types of art work that is bizarre." One difficulty we have with this phase of the cross-examination is that the jurors did not have before them the paintings of appellant so as to be able to judge the differences the doctor saw in appellant's paintings compared with those of the famous artists.

■■■ Should the issue of appellant's mental responsibility for the indicted conduct be retried, and appellant's paintings again be referred to as contributing to a diagnosis of his mental condition, followed, we think inadvisedly, by the exhibition to the jury of the paintings of well-known artists, as occurred at this

trial, we think the witness under examination may not be asked to pass upon the mental condition of those artists. To do so raises collateral issues foreign to the trial of appellant. Moreover, the paintings of appellant referred to by his witness, if they can be made available, should be exhibited to the jury for comparison with any paintings of the well-known artists which might be exhibited. Unless these precautions, with any others thought appropriate by the trial judge, are taken, the proceedings become so misleading as to be quite unfair to the jury and, therefore, to appellant. We do not question, however, the right of the prosecution to seek to refute by expert testimony the appropriateness of using the paintings of a patient in aid of diagnosing his mental condition.

When considered together the several difficulties we have noted affecting the second phase of the trial combine to lead us to reverse the verdict on the insanity issue and to remand the case in that respect for further proceedings consistent with this opinion, while affirming the verdict reached on the first phase of the bifurcated trial.

It is so ordered.

## SUPPLEMENTAL OPINION

FAHY, Senior Circuit Judge:

The opinion of the court of April 7, 1975, 167 U.S.App.D.C. ——, 510 F.2d 1283, 1288, refers to a motion of stipulation proposed to be filed by counsel for appellant correcting, as erroneous, a portion of the transcript of the trial relied upon by the United States as constituting a waiver of appellant's claim of right to a separate jury. Our opinion states, "we have received no stipulation or motion . . . ." The fact is an order of the trial judge correcting the record, based on a stipulation of counsel for the parties, was filed prior to argument of this case, but it was not brought to the attention of the court until subsequent to issuance of the court's opinion April 7, 1975. The stipulation and order confirm the analysis of the transcript in all relevant respects as made by the court in its opinion.