### Leon D. COOPER, Appellant,

v.

### UNITED STATES, Appellee.

### No. 83–1558.

District of Columbia Court of Appeals.

Argued Sept. 26, 1985.

Decided July 28, 1986.

Blair Brown, Public Defender Service, with whom James Klein and Mark Carlin, Public Defender Service, Washington, D.C., were on briefs, for appellant.

T. Mark Flanagan, Jr., Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, Thomas J. Tourish, Jr., and James F. Rutherford, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before PRYOR, Chief Judge, and MACK and BELSON, Associate Judges.

BELSON, Associate Judge:

A jury convicted Leon D. Cooper of voluntary manslaughter while armed, D.C.

---

Code §§ 22–2405 and –3202, and carrying a pistol without a license, *id.* –3204. On appeal, Cooper asserts that the trial judge erred when he refused to instruct the jury that the appellant had an unqualified right to stand his ground in the face of an attack in his home, but instead instructed the jury in the language of Instruction 5.16B, Criminal Jury Instructions for the District of Columbia (3d ed. 1978), the standard instruction on the use of deadly force in self-defense. Finding no error, we affirm.

Leon Cooper and his brother Robert Parker lived with their mother, Alice Cooper. In the early part of August 1981, Parker unexpectedly left home for 10 days. Early on the morning of August 12th, he returned. He did not tell his mother or brother where he had been.

Parker stayed home for much of the day. Mrs. Cooper returned from work in the evening, and Cooper returned from his job shortly afterward. Cooper was carrying a pistol when he returned. The three were sitting in Mrs. Cooper's small living room when the two brothers began to quarrel after Cooper asked Parker where he had been during the past 10 days.

Suddenly, the quarrel escalated, and the two brothers found themselves standing in the middle of the living room, shouting at each other. Parker hit Cooper in the head with a small radio; Mrs. Cooper ran upstairs to call for help. She then heard a "pop." She went downstairs and saw Parker lying on the floor. Cooper said "I have shot my brother" and "Mama, I am so sorry. I mean—." Cooper later told the police that he had just shot his brother, that his brother was hitting him with the

radio and "I couldn't take it anymore and I just shot him."

At trial, Cooper's counsel objected to instruction 5.16B, the standard instruction given when the defendant raises a claim of self-defense. The court instructed the jury, in pertinent part:

Now, if the defendant—If the defendant could have safely retreated but did not do so, his failure to retreat is a circumstance which you may consider together with all the other circumstances in determining whether he went further in repelling the danger, real or apparent, than he was justified in doing so under the circumstances.

Before a person can avail himself [of] the plea of self-defense against a charge of homicide, he must do everything in his power, consistent with his own safety, to avoid the danger and avoid the necessity of taking life. However, if the defendant actually believed that he was in imminent danger of death or serious bodily harm, and that deadly force was necessary to repel such danger, he was not required to retreat or consider whether he could safely retreat. He was entitled to stand his ground and use such force as was reasonably necessary under the circumstances to save his life or protect himself from serious bodily harm.

This instruction virtually tracks the language of Instruction 5.16B.[1]

Appellant took the position that the second sentence of the instruction which begins, "Before a person can avail himself [of] the plea of self-defense," inappropriately imposed a duty to retreat in the face of an attack. The trial court overruled

---

**1.** The text of Instruction 5.16B instructs the jury that the defendant must have actually believed *and had reasonable grounds to believe* that he was in imminent danger. We note that the trial court instructed the jury only that the defendant must have actually believed that he was in imminent danger. This omission does not give Cooper cause to complain, for it worked to his advantage. *See Carter v. United States,* 475 A.2d 1118, 1124 (D.C.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1222, 84 L.Ed.2d 362 (1985) (noting that instruction requiring that defendant actual-

ly believe and have reasonable grounds for believing he is in imminent danger before invoking self-defense correctly stated the law), *Gillis v. United States,* 400 A.2d 311, 313 (D.C.1979) (same); *see also United States v. Peterson,* 157 U.S.App.D.C. 219, 227, 483 F.2d 1222, 1230, *cert. denied,* 414 U.S. 1007, 94 S.Ct. 367, 38 L.Ed.2d 244 (1973) (self-defense predicated on actual and reasonable belief); *cf. Mitchell v. United States,* 399 A.2d 866, 869 (D.C.1979) (finding no plain error in instruction focusing solely on reasonable person standard).

counsel's objections. Defense counsel then asked the trial court for a "castle doctrine" instruction, *i.e.*, that a person has no duty whatsoever to retreat when attacked in his own home. The trial judge denied the request, stating that, in his opinion, the castle doctrine applies when a person in his home is attacked by a stranger or one who comes onto the premises without permission, but not when a fight occurs between two co-occupants. The jury found Cooper guilty of voluntary manslaughter while armed and carrying a pistol without a license, and the trial court sentenced him to a jail term of 8 to 24 years for the armed manslaughter conviction, and a consecutive term of 1 year for carrying a pistol without a license. This appeal followed.

## I.

We consider first whether, under the law of this jurisdiction, a person generally has the duty to retreat in the face of an assault by another, when retreat is a feasible alternative.

In *Gillis v. United States*, 400 A.2d 311 (D.C.1979), this court considered whether a person threatened with death or serious bodily harm has a duty to retreat, if it can be done safely, before using deadly force in defense. Gillis claimed that he had acted in self-defense when a man named Smith approached him on a deserted street late at night and accused him of being with Smith's girl friend. Gillis claimed that Smith reached in Smith's pocket, and pulled out a shiny object. Gillis then pulled out a pistol, shot, and mortally wounded Smith. Gillis was convicted of second-degree murder while armed.

On appeal, Gillis asserted that the trial court's jury instruction erroneously implied the existence of a duty to retreat, that instruction being essentially the instruction set out above except for its omission of the second sentence. We reviewed the conflicting precedents in the law of the District of Columbia regarding the duty to retreat, noting first that in *Marshall v. United States*, 45 App.D.C. 373 (1916), the court

held "[t]he right of a defendant when in imminent danger to take life does not depend upon whether there was an opportunity to escape. One under such circumstances is not compelled to stand aside, or to flee." *Gillis, supra,* 400 A.2d at 312, quoting *Marshall, supra,* 45 App.D.C. at 384. This formulation expressed an emphasis consistent with the so-called "American rule," which holds that one is not required to retreat whether he is attacked in his home or elsewhere, but may stand his ground and defend himself.

We also noted in *Gillis*, however, that later in *Laney v. United States*, 54 App. D.C. 56, 294 F. 412 (1923), the Circuit Court of Appeals had written:

"It is a well-settled rule that, before a person can avail himself of the plea of self-defense against the charge of homicide, he must do everything in his power, consistent with his safety, to avoid the danger and avoid the necessity of taking life.... In other words, no necessity for killing an assailant can exist, so long as there is a safe way open to escape the conflict."

*Gillis, supra,* 400 A.2d at 312 (quoting *Laney, supra,* 54 App.D.C. at 58, 294 F.2d at 414). *Laney* used language consistent with what is known as the common law, "retreat to the wall," rule.

Faced with these apparently conflicting precedents, the *Gillis* court reconciled them in what it termed a "middle ground" approach to self-defense. *Id.* at 313. The middle ground approach imposes no duty to retreat, but it "permit[s] the jury to consider whether a defendant, if he safely could have avoided further encounter by stepping back or walking away, was actually or apparently in imminent danger of bodily harm. In short, this rule permits the jury to determine if the defendant acted too hastily, was too quick to pull the trigger." *Id.* We affirmed in *Gillis*, holding that the instruction given did not impose a duty to retreat, but allowed a failure to retreat, together with all the other circumstances, to be considered by the jury in determining

whether the case was truly one of self-defense. *Id.*

The unique question presented in this appeal is whether, when one is assaulted in one's home by a co-occupant, the availability of a means of retreat is as much a consideration as it otherwise is under the middle ground approach. No cases in this jurisdiction have been called to our attention which address the question regarding an occupant's duty or ability to retreat in the face of an assault by a co-occupant, nor have we been able to identify any.[2] We look, then, to see how other courts have addressed this issue.

We begin by noting that the question whether an occupant has a duty to retreat when assaulted by a co-occupant will not arise in those jurisdictions which follow the American rule, for in those jurisdictions one can stand one's ground regardless of where one is assaulted, or by whom. Therefore, whatever guidance is available is provided by the courts of those jurisdictions which follow the common law, "retreat to the wall," rule.

Those jurisdictions following the common law rule have almost universally adopted the "castle doctrine" that one who through no fault of his own is attacked in one's own home is under no duty to retreat. *United States v. Peterson,* 157 U.S.App.D.C. at 233, 483 F.2d at 1236. While the status of the castle doctrine in the District of Columbia has never been squarely decided, *id.* at 234, 483 F.2d at 1237, we will assume for purposes of this discussion that appellant is correct in maintaining that the doctrine is applicable here.

Courts following the common law rule have split, however, regarding whether a defendant is entitled to a castle doctrine instruction when the defendant is assaulted by a co-occupant. An early case addressing this question was *People v. Tomlins,* 107 N.E. 496 (N.Y.1914). In *Tomlins,* a father shot and killed his son in their cot-

tage. The New York Court of Appeals held that an instruction which informed the jury that the father had a duty to retreat was erroneous. *Id.* at 497. The court first noted that if a man is assaulted in his home, "he may stand his ground and resist the attack. He is under no duty to take to the fields and the highways, a fugitive from his own home." *Id.* The court then held that the rule is the same whether the attack is initiated by an intruder or a co-occupant; "why ... should one retreat from his own house, when assailed by a partner or co-tenant, any more than when assailed by a stranger who is lawfully on the premises? Whither shall he flee, and how far, and when may he be permitted to return?" *Id.* at 498.

As other courts grappled with this question, they often returned to the questions posed by the *Tomlins* court, although frequently reaching a different result. A majority of courts favors giving a castle doctrine instruction when a defendant claims self-defense when attacked in his home by a co-occupant, *see, e.g., State v. Browning,* 28 N.C.App. 376, 221 S.E.2d 375 (1976); *People v. Lenkevich,* 394 Mich. 117, 229 N.W.2d 298 (1975); *State v. Grantham,* 224 S.C. 41, 77 S.E.2d 291 (1953); *State v. Phillips,* 187 A. 721 (Del.1936), while a substantial minority holds that the castle doctrine does not apply in this special circumstance, *e.g., State v. Bobbitt,* 415 So.2d 724 (Fla.1982); *Commonwealth v. Walker,* 477 Pa. 146, 288 A.2d 741 (1972); *State v. Grierson,* 96 N.H. 36, 69 A.2d 851 (1949). Those decisions which favor giving a castle doctrine instruction stress the occupant's interest in remaining in the home, *e.g., Tomlins,* 107 N.E. at 497, *Phillips,* 187 A. at 721, while those that oppose giving the instruction focus on the entitlement of both combatants to occupy the house and the fact that they usually are related, and reason that the parties have some obligation

---

2. In *Gillis,* we quoted dicta from *United States v. Peterson,* 157 U.S.App.D.C. 219, 483 F.2d 1222 (1973), recognizing the "castle doctrine." *Gillis,* *supra,* 400 A.2d at 312 n. 4. *Peterson* did not discuss whether the castle doctrine is applicable when an occupant is assaulted by a co-occupant.

to attempt to defuse the situation, *e.g.,* *Bobbitt,* 415 So.2d at 726.

Having examined these authorities, we are convinced that the reasoning of those jurisdictions holding that a castle doctrine instruction should *not* be given in instances of co-occupant attacks is the more compelling. As the Florida Supreme Court noted in *Bobbitt, supra,* both the decedent husband and accused wife in the case before it "had equal rights to be in the 'castle' and neither had the legal right to eject the other." *Id.* The court further observed:

> We see no reason why a mother should not retreat from her own son, even in her own kitchen. Such a view does not render her defenseless against a member of her family gone berserk, because ... a person placed in the position of imminent danger of death or great bodily harm to himself by the wrongful attack of another has no duty to retreat if to do so would increase his own danger of death or great bodily harm.

*Id.,* quoting *Conner v. State,* 361 So.2d 774, 776 (Fla.Dist.Ct.App.1978).

 Although in *Bobbitt,* the Florida Supreme Court used the analogy of a mother attacked by her son, that court's reasoning is also applicable to situations where a daughter attacks her father, a husband attacks his wife, or as here, a brother attacks his brother. Indeed, all co-occupants, even those unrelated by blood or marriage, have a heightened obligation to treat each other with a degree of tolerance and respect. That obligation does not evaporate when one co-occupant disregards it and attacks another. We are satisfied, moreover, that an instruction that embraces the middle ground approach appropriately permits the jury to consider the truly relevant question, *i.e.,* whether a defendant, "if he safely could have avoided further encounter by stepping back or walking away, was actually or apparently in imminent danger of bodily harm." *Gillis, supra,* 400 A.2d at 313. We hold that evidence that the defendant was attacked in his home by a co-occupant did not entitle him to an instruction that he had no duty whatsoever to retreat. The trial court did not err in refusing to give a castle doctrine instruction under the circumstances of this case.

## II.

 Cooper also contends that instruction 5.16B is an incorrect and inadequate expression of this jurisdiction's law when a defendant claims that he acted in self-defense to ward off an attack occurring in his own home. We have already rejected the main thrust of his argument, *i.e.,* that the jury must be given a castle doctrine instruction when a person is attacked in his home by a co-occupant. Cooper, however, argues also that the instruction actually encourages the jury to draw an adverse inference from the defendant's failure to retreat by including the following sentence: "Before a person can avail himself of the plea of self-defense against a charge of homicide, he must do everything in his power, consistent with his own safety, to avoid the danger and avoid the necessity of taking life." This court has previously considered, and rejected, that contention.

In *Carter v. United States, supra,* 475 A.2d 1118 (D.C.1984), the defendant had killed a man during a fight at his mother's house. Among other contentions, Carter asserted that the same language in instruction 5.16B to which Cooper objects inappropriately imposed a duty to retreat. The *Carter* court noted that when viewed in isolation, the sentence appears to impose a duty to retreat, *id.* at 1124, and we agree that this sentence is not an ideal formulation to explain the tension between a defendant's duty to avoid danger and his right to defend himself when that danger is imminent. The *Carter* court went on to hold, however, that the propriety of a trial court's instruction is determined from the context of the overall charge and, taken as a whole, the instruction correctly stated the law in this jurisdiction. *Id.* The court wrote:

> [T]he content of the [instruction to which Cooper now objects] did not impose upon

appellant a mandatory duty to retreat. Rather, it served to clarify a factor which the jury was privileged to consider when evaluating a claim of self-defense.

*Id. Carter* directly rejects Cooper's contention that because the second sentence in instruction 5.16B can be read to imply that the defendant has a duty to retreat, the entire instruction is fatally defective, and we are bound by that panel's decision. *M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C. 1971).

In view of the foregoing, we affirm Cooper's convictions.

*Affirmed.*